# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

In re:                                              §
                                                    §
**SOJITZ CORPORATION OF AMERICA**                   §
                                                    §
**REQUEST FOR DISCOVERY**                           §
**PURSUANT TO 28 U.S.C. § 1782**                    §      C.A. NO. 17 MISC 11
                                                    §
                                                    §
                                                    §
                                                    §

**DECLARATION OF NEIL A. QUARTARO IN SUPPORT OF APPLICATION**
**FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

I, Neil A. Quartaro, affirm under penalty of perjury that:

1.      I am over the age of 21 and am competent to testify to the matters attested to herein.

2.      I am an attorney with Watson, Farley and Williams LLP, counsel of record to Sojitz Corporation of America (the "Applicant") in the above-captioned action.

3.      I make this declaration based upon my personal knowledge and upon a review of documents and correspondence kept in the ordinary course of business, except for those statements made upon information and belief, and these I believe to be true.

4.      I make this declaration in support of Applicant's request for an order from this court pursuant to 28 U.S.C. § 1782 (the "1782 Application") authorizing them to issue and serve two subpoenas *duces tecum* for documents located in this district in the possession and control of the American International Group and the Willis Group.

5.      The evidence requested in the 1782 Application is sought in connection with an ongoing foreign arbitration proceeding (the "Arbitration") conducted in London under the auspices of the International Chamber of Commerce (the "ICC").

80482552v3

## PRELIMINARY STATEMENT

Applicant Sojitz Corporation of America ("Applicant") respectfully submits this Memorandum and the accompanying Declaration of Neil A. Quartaro in Support of Application for Discovery Pursuant to 28 U.S.C. § 1782 (the "Quartaro Dec.") in support of its application for an order, pursuant to 28 U.S.C. § 1782, authorizing discovery in the form of production of relevant documents in the possession, custody and/or control of two entities present in this district, Willis Towers and Watson (formerly the Willis Group) (the "Willis Group") and the American International Group ("AIG"). These documents will be used in the aid of an ongoing foreign arbitration (the "Arbitration") between Applicant and Ashland, Inc. ("Ashland") under the auspices of the International Court of Arbitration of the International Chamber of Commerce (the "ICC"). The Arbitration involves a dispute regarding payment from the sale of butadiene whose post-delivery voyage was interrupted due to a general average event[1]. Specifically, the documents sought will be used to provide critical evidence as to whether or not Ashland was compensated by their insurer, AIG, under their policy covering losses resulting from the declaration of general average arising from a vessel explosion following the sale and delivery of butadiene by Applicant to Ashland under a duly executed sales contract. Both Applicant and Ashland have agreed to the Arbitration without reservation. Ashland's counsel has advised the ICC that it has no objections to the discovery sought herein. Quartaro Dec. ¶ 41, Exhibit 5.

---

[1]   "General average is a venerable doctrine of maritime law that dates back 2,800 years. The doctrine provides that when a portion of ship or cargo is sacrificed to save the rest from a real and substantial peril, each owner of property saved contributes ratably to make up the loss of those whose property has been sacrificed. General average contribution exists independently of marine insurance and is owed even in the absence of cargo insurance. However, cargo owners typically insure themselves against possible obligation arising from a general average situation." *Shaver Transp. Co. v. Travelers Indem. Co.*, 481 F. Supp. 892, 897 (D. Or. 1979) (Internal citation omitted).

80482592v3

## FACTUAL BACKGROUND

The facts relevant to the instant application are set forth in more detail in the accompanying Application and the Quartaro Dec. and are briefly outlined below.

### Background of Dispute

On May 20, 2016, Applicant requested arbitration of its dispute with Ashland concerning an outstanding balance for a butadiene shipment delivered pursuant to a "Purchase and Sale Agreement of Butadiene" agreement covering the period from July 1, 2012 through December 31, 2014 (the "SCA-Ashland Sale Contract"). Quartaro Dec. ¶ 18, Exhibit 1, Ex. A; Exhibit 1. The dispute giving rise to the Arbitration relates to the sale and delivery of a parcel of butadiene (the "Cargo") under INCOTERMS 2010 "CFR [destination]" shipping terms. Quartaro Dec. ¶ 13. According to INCOTERMS 2010 "CFR" Shipping Terms, the seller, in this case Applicant, delivers goods by placing them aboard the performing vessel. Quartaro Dec. ¶ 14.

Applicant purchased the Cargo from non-party Braskem S.A. ("Braskem") pursuant to a "Purchase and Sale Agreement of Butadiene" between Braskem as Seller and Applicant as Buyer and covering the period July 1, 2012 to December 31, 2014. Quartaro Dec. ¶ 15. Applicant on-sold the Cargo to Ashland pursuant to the SCA-Ashland Sale Contract. Quartaro Dec. ¶ 16. The SCA-Ashland Sale Contract required Applicant to deliver the Cargo to Ashland on "CFR Port Neches" terms. Quartaro Dec. ¶ 17, Exhibit 1, Ex. A ¶ 5. The SCA-Ashland Sale Contract further states "[t]itle and risk of loss of damage to the goods shall both pass from Seller to Buyer at the load port as material passes the ingoing flange of the vessel." Quartaro Dec. ¶ 18, Exhibit 1 ¶ 15.

The Cargo was delivered to Ashland upon being laden aboard the performing vessel, M/T GOLDEN MILLER (the "Vessel"). Quartaro Dec. ¶ 19. Unfortunately, there was a fire aboard

80482592v3

the Vessel while she lay at the loading port of Salvador, Brazil (the "Casualty").  Quartaro Dec. ¶ 20.  The fire occurred in the compressor room on-board the Vessel after the Cargo was successfully loaded, but before the Vessel left the dock.  Quartaro Dec. ¶ 21.  The Cargo was undamaged by the fire.  Applicant timely passed all information regarding the casualty to Ashland. Quartaro Dec. ¶ 22.

The Vessel owner apparently determined that, due to fire damage, the Vessel could not complete its intended journey to Port Neches, Texas, USA.  Quartaro Dec. ¶ 23.  On December 20, 2013, the Vessel owner declared general average and the Vessel was towed to Freeport, Bahamas, where the cargo was transshipped to Port Neches aboard a substitute vessel, M/V GASCHEM BALTIC.  Quartaro Dec. ¶ 24.

The Vessel's declaration of general average required Ashland to pay $340,311.53 as its pro-rata contribution to the costs of saving the Vessel and Cargo and arranging the substitute vessel to deliver the Cargo to Ashland.  Quartaro Dec. ¶ 25.  On February 24, 2014, Ashland submitted a short payment to Applicant for the Cargo of $1,695,699.38 against Applicant's invoice of $2,036,010.91.  Quartaro Dec. ¶ 26.  The unpaid balance of $340,311.53 was unilaterally set-off by Ashland, forcing Applicant to initiate the Arbitration.  Quartaro Dec. ¶ 27.

**Arbitral Proceeding and Need for Relief Under 28 U.S.C. § 1782**

Following Applicant's request for arbitration with the ICC, a panel of 3 arbitrators was appointed and the necessary procedural steps proscribed by the ICC were undertaken by both Applicant and Ashland to formally begin the Arbitration.  Quartaro Dec. ¶ 28.  Pursuant to the discovery procedure and schedule agreed upon in the Terms of Reference filed with the ICC on November 4, 2016 both Applicant and Ashland made an initial exchange of relevant documents. Quartaro Dec. ¶ 29.  In its initial disclosure, Applicant produced over 700 (seven hundred) pages

80482592v3

of documents to Ashland. Quartaro Dec. ¶ 30. In its initial disclosure, Ashland produced only 33 (thirty-three) pages of documents, comprised mostly of the SCA-Ashland Purchase Agreement, a letter between Applicant's counsel and Ashland's counsel, invoices between the parties and a news story about the Casualty. Significantly, Ashland's initial production provided no new information surrounding the events leading to the Arbitration. Quartaro Dec. ¶ 31.

Throughout the Arbitration, Ashland has denied that general average was declared or that Ashland's insurer covered this risk. Quartaro Dec. ¶ 32. Among the documents produced by Applicant is a chain of correspondence between Ashland and the Willis Group, a general average adjustor known today as Willis Towers and Watson, discussing the fire aboard the Vessel (the "Insurance Discussion"). Quartaro Dec. ¶ 33, Exhibit 2. The Insurance Discussion shows that Ashland was aware of the declaration of general average following the Casualty and that Ashland asked to be put in direct contact with the average adjustor, the Willis Group, without having to include Applicant. Quartaro Dec. ¶ 34. The Insurance Discussion also shows that Ashland tendered the payment of a general average bond, and perhaps the handling of the entire general average incident, to its insurer AIG. Quartaro Dec. ¶ 35. Once Ashland was in direct contact with the Willis Group, Applicant was no longer included on any communications regarding the Casualty and has no information about the outcome of Ashland's insurance claim. Quartaro Dec. ¶ 36.

In response to Ashland's production, and as permitted by the ICC's scheduling order, Applicant wrote to Ashland's counsel seeking specific additional documents relating to the declaration of general average and the involvement of Ashland's insurance provider, AIG. Quartaro Dec. ¶ 37. Following Applicant's letter, Ashland made a second production of documents with 56 (fifty-six) pages of documents, including a copy of the insurance contract with

AIG.  The AIG contract showed that Ashland carried general average insurance coverage when the Casualty occurred.  Quartaro Dec. ¶ 38.  Ashland's counsel has informed the Applicant that they were no longer in possession of any relevant documents because Ashland has destroyed emails and documents that might be responsive to Applicant's request.   Quartaro Dec. ¶ 39.  Because Ashland cannot produce any documents relevant to Applicant's request, Applicant must obtain these documents directly from AIG and the Willis Group, both of whom have offices in this district.  Quartaro Dec. ¶ 40.  This evidence is critical to Applicant's case because it will definitively establish the liability of Ashland by establishing that general average was declared (which Ashland denies) and that Ashland had insurance coverage for this risk as the owner of the Cargo.

Applicant, through its undersigned Counsel, has advised Ashland's counsel that Applicant intends to seek the third party discovery sought herein.  Quartaro Dec. ¶ 41.  Ashland's counsel has advised counsel and the arbitral tribunal (the "Tribunal") that Ashland does not object to this application.  Quartaro Dec. ¶ 41, Exhibit 5.

## ARGUMENT

### 1.  28 U.S.C. § 1782 PROVIDES FOR DISCOVERY IN AID OF A PROCEEDING IN A FOREIGN TRIBUNAL

Title 28 U.S.C. § 1782 ("§ 1782") "is the product of congressional efforts, over the span of [over] 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004)).   § 1782 provides that the:

> district court of the district in which a person resides or is found
> may order him to give his testimony or statement or to produce a
> document or other thing for use in a proceeding in a foreign or

80482592v3

> international tribunal, including criminal investigations conducted
> before formal accusation. The order may be made pursuant to a
> letter rogatory issued, or request made, by a foreign or international
> tribunal or upon the application of any interested person and may
> direct that the testimony or statement be given, or the document or
> other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a).

The Second Circuit has summarized the requirements for a § 1782 application as:

> [t]he statutory language is unambiguous in its requirements: (1) the
> person from whom discovery is sought must reside or be found in
> the district of the district court to which the application is made, (2)
> the discovery must be 'for use in a proceeding in a foreign or
> international tribunal,' and (3) the application must be made 'by a
> foreign or international tribunal' or by 'any interested person.'

*Application of Gianoli Aldunate*, 3 F.3d 54, 58 (2d Cir. 1993) (Internal citations omitted).

   a. *Discovery is sought from businesses present in this district*

   The requirement of presence within the district is met as both AIG and the Willis Group

maintain offices within this district.  Quartaro Dec. ¶¶ 10-11.  In fact, according to the Willis

Group's internet directory of office locations, they maintain at least 3 such facilities within this

district.  Similarly, AIG maintains multiple offices throughout the jurisdiction of this Court.

   b. *The discovery requested will be used in an ongoing foreign arbitration*

   The discovery sought by this §1782 application is for use in an ongoing foreign arbitration

before the ICC in London.  Quartaro Dec. ¶ 12, Exhibit 1.  Prior to the U.S. Supreme Court

decision in *Intel*, the Second Circuit had determined that private arbitrations did not qualify as

foreign proceedings under § 1782. (*See Nat'l Broad. Co. v. Bear Stearns & Co.*, 165 F.3d 184,

190 - 191 (2d Cir. 1999).  However, the Supreme Court's holding in *Intel* has led many courts,

including the Southern District of New York, to expand the applicability of § 1782 to private

arbitrations, including those conducted by the ICC. *See In Re Ex Parte Application of Kleimar*

*N.V.*, 2016 WL 6906712, at *3 (S.D.N.Y. 2016) ("The Court is persuaded by the reasoning of

80482592v3

courts that have concluded that the LMAA is a 'foreign tribunal' within the domain of Section 1782." § 1782 relief denied on other grounds)). (*Jiangsu Steamship Co. v. Success Superior Ltd.*, 2015 WL 3439220, at *6 (S.D.N.Y. 2015) ("[The Supreme Court in *Intel*] merely acknowledge[d] the reality that proceedings in tribunals other than law courts can be adjudicative in nature. Arbitrations, for example, are 'adjudicative' in nature . . ." but denying § 1782 relief on other grounds)); *See Also*: (*In re Owl Shipping, LLC*, No. CIV.A. 14-5655 AET, 2014 WL 5320192, at *2 (D.N.J. 2014) ("[T]he discovery sought is for use in a proceeding before the London Maritime Arbitrators Association, which constitutes a foreign tribunal under § 1782.")) (*In re Babcock Borsig AG*, 583 F. Supp. 2d 233, 238 (D.Mass. 2008) "The Court in *Intel* did not directly address whether private arbitral bodies like the ICC qualify as 'tribunals' under § 1782(a). But the Court's reasoning and dicta strongly indicate that these types of adjudicative bodies also fall within the statute.")) (*In re Hallmark Capital Corp.*, 534 F. Supp. 2d 951, 957 (D.Minn. 2007) ("[T]his Court concludes that the assistance permissible under Section 1782 may extend to private arbitration bodies such as that at issue here.")) (*In re Roz Trading Ltd.*, 469 F. Supp. 2d 1221, 1224 (N.D.Ga. 2006) ("Although the Supreme Court in *Intel* did not address the precise issue of whether private arbitral panels are 'tribunals' within the meaning of the statute, it provided sufficient guidance for this Court to determine that arbitral panels convened by the [International Arbitral Centre of the Austrian Federal Economic Chamber in Vienna] are 'tribunals' within the statute's scope.")).  Given the weight of recent precedent within, and without, this district, the ongoing ICC arbitration for which this discovery is requested satisfies the foreign tribunal requirement of § 1782.

80482592v3

c.  *Discovery is being requested by the initiator of the Arbitration*

The Southern District of New York, citing *Intel*, stated that interested persons "include anyone, such as litigants . . . , who has a reasonable interest in obtaining the information requested." *Jiangsu*, 2015 A.M.C. 884, at *3.  In *Intel*, the Supreme Court determined that an interested person "[n]o doubt [includes] litigants . . . [who] may be the most common example of [] the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256.  Further, the Court found that a "complainant who triggers a European Commission investigation has a significant role in the process" particularly when they have "the right to submit information for . . . consideration[] and may proceed to court" if their complaint is dismissed.  *Id*.  These "participation rights" qualified the applicant in *Intel* "as an 'interested person' within any fair construction of that term[,]" despite the fact that they were not "litigants" in a judicial dispute.  *Id*.

In the present matter now before this Court, Applicant is the party that began the Arbitration.  Quartaro Dec. 12, Exhibit 1.  Applicant, through the Arbitration, is attempting to recover funds due it by Ashland's failure to pay.  As such, Applicant is comparable to a "litigant" in a traditional court setting and certainly has a stronger interest in the discovery sought herein than a mere "interested person" as outlined in *Intel*.  Thus, Applicant is clearly an "interested person" for purposes of § 1782.

2.  **THE § 1782 REQUEST SATISFIES THE DISCRETIONARY FACTORS OF *INTEL***

Applicant respectfully contends that the instant application satisfies the requirements of § 1782, but the decision to grant the requested relief is within the discretion of the Court.  The four discretionary factors from *Intel* that the Court should consider in analyzing a § 1782 application have been summarized by the Southern District of New York as:

80482592v3

(1) Whether the person from whom discovery is sought is a participant in the foreign proceeding, in which case 'the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad';

(2) 'the nature of the foreign tribunal, the character of proceedings underway abroad, and the receptivity of the foreign government, court, or agency to federal-court judicial assistance';

(3) 'whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States'; and

(4) whether the discovery requests are 'unduly intrusive or burdensome.'

*In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*, 2006 WL 3844464, at *4 (S.D.N.Y. 2006) (Hon. Barbara S. Jones) (citing *Intel* 542 U.S. at 264-65).

a. *The parties from whom discovery is being sought are not participants in the Arbitration*

The Applicant seeks § 1782 assistance in obtaining limited discovery from two non-parties, AIG and the Willis Group, who possess documents that are necessary for Applicant's claim in the Arbitration.  Neither party is involved in the Arbitration.

b. *The discovery sought is of the same character as that which has already been disclosed as part of the Arbitration's discovery process*

The Tribunal currently can only analyze the question of whether or not Ashland recovered from its insurer, AIG, based on an incomplete record.  Ashland has advised that it has destroyed most of the documents and communications it possessed related to the Casualty.  As such, the Tribunal will benefit from the discovery requested herein because it will provide the documentation necessary to prove whether or not the Casualty was a general average event and whether Ashland recovered any funds based on its claim with AIG arising from the Casualty.  As such, the Tribunal has a strong interest in receiving and considering the documents that will be provided should this Court provide § 1782 assistance to the Applicant.

c. *The discovery request is not contested by Applicant's opponent or the Tribunal*

Ashland, through its counsel, has advised that it does not object to Applicant's § 1782 request.  Quartaro Dec. ¶ 41, Exhibit 5.  Furthermore, the Tribunal indicated that it has no

objections to Applicant's request.  Exhibit 2.  Therefore, the Applicant's request for § 1782 assistance does not run afoul of any procedural or discovery rules governing the Arbitration and the documents sought by Applicant would be otherwise appropriate for a discovery request under the Federal Rules of Civil Procedure.

   d.  *The discovery request is narrowly tailored and seeks documents from specific entities involved in the aftermath of the Casualty*

   Applicant's discovery request is the product of Ashland's inability to provide a full record of its activity surrounding the Casualty.  Furthermore, Applicant's request is informed by the record and is, accordingly, narrowly tailored to target two entities already shown to possess documents central to the dispute giving rise to the Arbitration.  Furthermore, the documents requested are related to a specific, definable event – the Casualty – with specific date ranges. Applicant has shown that both AIG and the Willis Group were involved in Ashland's potential recovery of damages resulting from the Casualty.  AIG and the Willis Group communicated with Ashland regarding such recovery.  Applicant has produced Ashland's insurance policy containing coverage for a general average event precisely like the Casualty.  Quartaro Dec. ¶ 38, Exhibit 3. Applicant's § 1782 request is in no way a "fishing expedition" and is intended to assist an ongoing foreign proceeding wherein there is no objection to the Application and no other means whereby the target documents can be produced.

## Conclusion

   For the reasons set forth above, Applicant respectfully submits that it has met all of the criteria for the issuance of an order authorizing discovery pursuant to 28 U.S.C. § 1782 and that this Court should therefore exercise its discretion to execute the proposed order directing the production of documents in aid of the ongoing foreign arbitration proceedings engaged in between Applicant and Ashland.

80482592v3

Dated: New York, New York
      January 5, 2017

Neil A. Quartaro
Zachary J. Farley
WATSON FARLEY AND WILLIAMS
250 West 55th St.
New York, NY 10019
Tel: (212) 922-2200
nquartaro@wfw.com

80482592v3

# EXHIBIT 1

## Zachary Farley

| | |
|---|---|
| **From:** | Zachary Farley |
| **Sent:** | Friday, May 20, 2016 11:38 AM |
| **To:** | 'ica9@iccwbo.org' |
| **Cc:** | Neil Quartaro |
| **Subject:** | Request for Arbitration - Sojitz Corporation of America |
| **Attachments:** | SCA Request for Arbitration.pdf |

To Whom It May Concern:

Please find attached to this email a Request for Arbitration and the Arbitration Agreement submitted on behalf of, and with the authority of, our client Sojitz Corporation of American for purposes of commencing an arbitral proceeding against Ashland Incorporated in London, England.  We will be delivering 6 bound copies of the attached along with the filing fee of US$3000, made to the order of SICANA Inc., to your offices at 1212 Avenue of the Americas New York, NY 10036 by overnight mail

Please let us know if anything further is required.

Best Regards,


**ZACHARY FARLEY**
Associate

Watson Farley & Williams LLP
250 West 55th Street | New York | New York 10019
T +1 212 922 2200 | D +1 212 922 2253
E-mail | Website

IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF
THE COURT OF ARBITRATION OF
THE INTERNATIONAL CHAMBER OF COMMERCE

between:

SOJITZ CORPORATION OF AMERICA

Claimant,

and

ASHLAND INC., formerly ISP Synthetic Elastomers L.L.C.,

Respondent.

**REQUEST FOR ARBITRATION**

COUNSEL FOR CLAIMANT

WATSON, FARLEY & WILLIAMS
250 West 55th Street
New York, New York 10019
Telephone: (212) 922-2200
Facsimile: (212) 922-1512

# TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| I. | REQUEST FOR ARBITRATION | 2 |
| II. | THE PARTIES | |
| | A. Claimant | 2 |
| | B. Defendant | 2 |
| III. | THE ARBITRATION CLAUSE | 2 |
| IV. | THE CLAIMANT'S CASE | 3 |
| V. | CLAIMANT'S DEMAND | 6 |
| VI. | NUMBER AND CHOICE OF ARBITRATORS, PLACE OF ARBITRATION | 7 |

80433862_1

- 2 -

## I.    REQUEST FOR ARBITRATION

Claimant, Sojitz Corporation of America ("SCA"), hereby requests arbitration of its dispute with Respondent, Ashland, Inc. ("Ashland"), concerning an outstanding balance for a butadiene shipment delivered pursuant to a "Purchase and Sale Agreement of Butadiene" agreement covering the period from July 1, 2012 through December 31, 2014 (the "SCA-Ashland Sale Contract"). A copy of the SCA-Ashland Sale Contract (without exhibits) is submitted herewith as Exhibit A.

## II.   THE PARTIES:

A.    Claimant:

SCA SOJITZ CORPORATION OF AMERICA, with offices located at 3 Riverway, Suite 800, Houston, TX 77056, and with its head office at 1211 Avenue of the Americas, New York, NY 10036, is a corporation organized and existing under the laws of New York. SCA is represented by counsel in this matter as follows:

> WATSON, FARLEY & WILLIAMS
> 250 West 55th Street
> New York, New York 10019
> Telephone:  +1 212 922 2200
> Facsimile:  +1 212 922 1512
> Attn.:  Neil Quartaro (nquartaro@wfw.com)
> Zachary Farley (zfarley@wfw.com)

B.    Respondent:

ASHLAND ASHLAND, INC., 50 E. Rivercenter Blvd., Covington, KY 41011, is a corporation organized and existing under the laws of Kentucky and is the successor entity to ISP SYNTHETIC ELASTOMERS, L.L.C., the named buyer under the SCA-Ashland Sale Contract. Ashland is represented by counsel in this matter as follows:

> FRILOT, LLC
> 1100 Poydras Street, Suite 3800
> New Orleans, LA 70163

- 3 -

+1 504 599 8200
+1 504 619 8100
Attn.:   T. Patrick O'Leary (poleary@frilot.com)
         Andrew S. de Klerk (adeklerk@frilot.com)

## III.    THE ARBITRATION CLAUSE:

The instant dispute falls within the arbitration provision in Section 21 of the SCA-

Ashland Sale Contract, which provides:

21. Arbitration:

> Any dispute arising out of or in connection with this agreement, including any question
> regarding its existence, validity or termination shall be referred to and finally resolved
> by arbitration under the International Chamber of Commerce ("ICC") rules, which
> rules are deemed to be incorporated by reference herein.  The number of arbitrators
> shall be three (3).  The seat or legal place of arbitration shall be London, England.  The
> language to be used in the arbitral proceedings shall be English.  The arbitration award
> shall be binding on the Parties.  Judgment upon the award may be entered by any court
> having jurisdiction thereof or having jurisdiction over the relevant Party or its assets.

All requirements of Section 21 of the SCA-Ashland Sale Contract have been satisfied to the

extent required for commencement of the instant proceedings.

Pursuant to Section 22 of the SCA-Ashland Sale Contract, the dispute is governed by

English law.

## IV.    THE CLAIMANT'S CASE:

This dispute relates to the sale and delivery of a parcel of butadiene (the "Cargo") under

INCOTERMS 2010 "CFR [destination]" shipping terms.  SCA entered into back-to-back

contracts for the sale and purchase of butadiene from Brazil to the United States.  SCA

purchased the Cargo from non-party Braskem S.A. ("Braskem") pursuant to a "Purchase and

Sale Agreement of Butadiene" between Braskem as Seller and SCA as Buyer and covering the

period July 1, 2012 to December 31, 2014 (the "Braskem-SCA Purchase Contract").  The

- 4 -

Braskem-SCA Purchase Contract required Braskem to deliver the cargo to SCA on "CFR Port Neches" terms. Port Neches, Texas was the port of delivery.

The Braskem-SCA Purchase Contract further provides "[t]itle and risk of loss or damage to the goods until it passes from Seller to Buyer at load port as material passes the ingoing flange of the vessel" (¶ 15).

SCA sold the Cargo to Ashland pursuant to the SCA-Ashland Sale Contract. The SCA-Ashland Sale Contract is on back-to-back terms with the Braskem-SCA Purchase Contract. The SCA-Ashland Sale Contract required SCA to deliver the Cargo to Ashland on "CFR Port Neches" terms identical to those in the Braskem-SCA Purchase Contract (¶ 5). The SCA-Ashland Sale Contract further states "[t]itle and risk of loss of damage to the goods shall both pass from Seller to Buyer at the load port as material passes the ingoing flange of the vessel" (¶ 15).

The Cargo was delivered to SCA and simultaneously on-sold and delivered to Ashland upon being laden aboard the performing vessel chartered by Braskem, M/T GOLDEN MILLER (the "Vessel").

By letter dated December 13, 2013 Braskem notified SCA that there had been a fire aboard the Vessel while she lay at the loading port of Salvador, Brazil. The fire occurred in the compressor room on-board the Vessel after the Cargo was successfully loaded, but before the Vessel left the dock. The Cargo was undamaged by the fire. SCA timely passed all information regarding the casualty to Ashland.

The Vessel owner apparently determined that, due to fire damage, the Vessel could not complete its intended journey to Port Neches, Texas, USA. On December 20, 2013, the Vessel

- 5 -

owner declared general average[1] and the Vessel was towed to Freeport, Bahamas, where the cargo was transshipped to Port Neches aboard a substitute vessel, M/V GASCHEM BALTIC.

The Vessel's declaration of general average required Ashland to pay $340,311.53 as its pro-rata contribution to the costs of saving the Vessel and Cargo and arranging the substitute vessel to deliver the Cargo to Ashland.

On February 24, 2014, Ashland submitted a short payment to SCA for the Cargo of $1,695,699.38 against SCA's invoice of $2,036,010.91. The unpaid balance of $340,311.53 was unilaterally set-off by Ashland. SCA protested this partial payment.

SCA relies on the plain language of the contract and the incorporated INCOTERMS 2010 shipping terms, which provide that, under a CFR contract, the "buyer bears all risks of loss of or damage to the goods from the time they have been delivered." [Incoterms 2010 CFR B5]. Delivery is accomplished by the seller "at the moment the goods are placed on board the vessel at the port of shipment." [Jan Ramberg, *ICC Guide to Incoterms 2010*, P. 186 (ICC Services Publication 2011 ed.)]. Pursuant to the SCA-Ashland Sale Contract the parties expressly agreed that "[t]itle and risk of loss or damage to the goods shall both pass from Seller to Buyer at the load port as material passes the ingoing flange of the vessel." [Ex. A, p. 5, ¶ 8]. There is no doubt that the fire onboard the Vessel that led to the declaration of general average occurred after the Cargo had been loaded onto the Vessel and, hence, delivered to Ashland under the CFR terms agreed upon by the parties. Therefore, under the terms of the SCA-Ashland Sale Contract, and CFR terms in general, all risk of loss and damage had transferred to Ashland before the fire broke out. SCA was no longer responsible for the risks and perils of the Vessel's journey once the Cargo was laden aboard. Under the law of general

---

[1]  The doctrine of General Average dates back at least 2800 years and provides that "each of the various parties having economic interests in continuation of a vessel's voyage, namely hull, freight, and cargo must contribute to any voluntary sacrifice made by the vessel with respect to a peril common to all of the interests which jeopardized the" safe completion of the voyage. [Charles M. Davis, *Maritime Law Desk Book*, P. 340 (Compass Publishing Co. 2010)].

- 6 -

average, all parties who have an ownership interest in a vessel and her cargo must share in the costs of bringing the cargo and ship to port on a prorated basis. Ashland had undisputed ownership of the Cargo once it was delivered to the Vessel and, as a result, the full responsibility for any general average contribution arising after delivery.

That Ashland agreed to bear this risk is further borne out by Ashland's agreement to insure the cargo for the ocean voyage [Ex. A, P. 6, ¶ 1]. Whether Ashland actually insured the Cargo is currently unknown, but there is no question that Ashland agreed to take delivery of the cargo as soon as it came aboard. Under Incoterms CFR contracts, "the seller is relieved from any further risk of loss of or damage to the goods when they have [been] placed on board . . . [and] the buyer has to assume these risks subsequent to the passing of that critical point." [*ICC Guide to Incoterms 2010*, P. 194].

Because the SCA-Ashland Sale Contract was back-to-back with the Braskem-SCA Purchase Contract, SCA never had actual title over the goods in question. Rather, once the Cargo crossed the Vessel's ingoing flange, title passed from Braskem to Ashland. At no point did SCA assume any of the risk of maritime peril during the journey. Under INCOTERMS 2010 "CFR" shipping terms, the seller "must contract for . . . the carriage of the goods from the agreed point of delivery . . . to the named port of destination." [Incoterms 2010 CFR A3(a)]. Further, the seller "must deliver the goods . . . by placing them on board the vessel . . . on the agreed date . . . and in the manner customary at the port." [Incoterms 2010 CFR A4]. The "seller fulfills its obligation to deliver when it hands the goods over to the carrier in the manner specified . . . and not when the goods reach the place of destination." [*ICC Guide to Incoterms 2010* at 183]. SCA fully performed its duties under the SCA-Ashland Sale Contract by delivering the Cargo and loading it onto the Vessel at the agreed upon time and place under the Contract. Accordingly, SCA's unpaid balance of $340,311.53 (now plus interest and costs) is being improperly withheld by Ashland.

- 7 -

The sole legal issue to be decided in the matter is whether, under INCOTERMS 2010 "CFR [destination]" shipping terms and the other provisions of the Cargo contracts with Ashland and Braskem, the shipper or the receiver bore the risk of a general average event.

## V.    CLAIMANT'S DEMAND:

Based on the foregoing, SCA requests the following award in its favor and against ASHLAND:

A.    That ASHLAND be ordered to pay remainder of the balance due under the SCA-Ashland Sale Contract;

B.    That ASHLAND be ordered to pay such interest as the Tribunal might award from the time the balance was due up to the time of the Award, with post-Award interest to accrue as appropriate;

C.    That ASHLAND be ordered to pay the costs and fees incurred in this matter, including but not limited to SCA's costs of counsel and of the arbitration, and such other costs as the Tribunal may find appropriate; and

D.    Such other and further relief as may be appropriate.

## VI.    NUMBER AND CHOICE OF ARBITRATORS, PLACE OF ARBITRATION:

Section 21 of the Contract provides that the arbitration will be conducted in English. Under Section 21, SCA and Ashland agreed that any dispute would be resolved "by arbitration under the International Chamber of Commerce ("ICC") rules, which rules are deemed to be incorporated by reference herein. The number of arbitrators shall be three (3). The seat or legal place to be used in the arbitral proceedings shall be London, England." Under Section 21 the arbitral award "shall be binding on" SCA and Ashland.

- 8 -

Pursuant to Article 12(4) of the Rules of Arbitration of the International Chamber of Commerce, SCA hereby nominates Bob Deering for confirmation of appointment to the arbitral tribunal for this dispute.  Mr. Deering's contact details are:

> Bob Deering
> BDM Law LLP
> 133 Houndsditch
> London
> EC3A 7BX
> +44 203 402 6011
> bob.deering@bdmlawllp.com

New York, New York
May 20, 2016

Respectfully submitted,

Neil Quartaro
Zachary Farley
WATSON FARLEY & WILLIAMS LLP
Attorneys for Claimant
SOJITZ CORPORATION OF AMERICA

# EXHIBIT A

## PURCHASE AND SALE AGREEMENT OF BUTADIENE

**1. Buyer:**  **ISP SYNTHETIC ELASTOMERS LLC** with its head office at
(ASHLAND) 50 E RIVERCENTER BLVD COVINGTON KY
(hereinafter called "Buyer")

**2. Seller:**  **Sojitz Corporation of America**
Three Riverway, Suite 800, Houston, TX 77056
with its head office at
1211 Avenue of the Americas, New York, NY 10036
(hereinafter called "Seller")
The "Buyer and Seller may be referred to individually, as a "Party", or together, as the "Parties".

**3. Product:**  Butadiene.

**4. Quality:**  As per Appendix I.

**5. Terms of Delivery:**  CFR PORT NECHES, TEXAS, USA. 1 safe port/1 safe berth

Final discharge port/berth to be declared up to 5 days after departure from load port

If Seller doesn't have this information, or Buyer changes its nomination of delivering port after initially informing Seller of its selection, all damages and costs incurred as a result of such change will be for Buyer's own account. These costs include, but are not limited to demurrage, costs of deviation, barges, port charges, duties and others costs.

Remark: Any deviation will be subject to port/berth restrictions and Owners conditions. Seller can inform additional lump sum for Buyer's own duty if requested extra ports/berths/deviation.

**6. Contract Period:**  From July 1st 2012 to December 31st 2014 (two years and six months), provided, however, that this agreement shall automatically terminate on the termination or cancellation date of the Purchase and Sale Agreement between Buyer

and Seller. "Calendar Year" shall mean each the twelve month period beginning on January 1 and ending on December 31.

**7. Quantity:**

6,000.00mt in 2012
Min. 7,000.00mt to max. 10,000.00 mt (Seller's option) in 2013 and 2014 per Calendar Year (the "Annual Volume")

Buyer shall purchase, and the Seller shall sell, the Annual Volume in 3 to 5 shipments of 2,000 – 2,376 mt in Seller's option, approximately one each calendar quarter. Parties will work together cooperatively to schedule shipments.

**Nomination:**

- Promptly after execution of this Agreement, Seller will provide Buyer with a delivery schedule with Buyer's best estimate of delivery months in 2012 (the "Delivery Schedule"). No later than 30 days after the start of each subsequent Calendar Year, Seller will provide Buyer with a delivery schedule with Seller's best estimate of delivery months in said Calendar Year.

- No later than 30 days prior to the beginning of each calendar quarter, Seller will nominate the month of loading in that calendar quarter for acceptance by Seller

- No later than 30 days prior to loading laycan, Seller will agree with Buyer a 10 day loading laycan and will provide Buyer with a vessel nomination to include:
  1. vessel's Form C,
  2. the Questionnaire 88 form;
  3. target delivery and loading dates,
  4. list of the last five (5) ports of call of the nominated vessel,
  5. list of the last three (3) prior cargoes for the nominated vessel, and
  6. written confirmation from vessel owner that maximum draft at time of discharge will be 26 feet.

- Buyer to confirm the vessel nomination to Seller as soon as reasonably possible and no later than 2 business days after receipt of such nomination.

In the event that either Party needs to change the Delivery



Schedule, such Party shall notify the other Party in writing. Thereafter, such Party may request that the Delivery Schedule may be adjusted, and the other Party shall not unreasonably withhold its consent to such a modification. Both Parties acknowledge that they intend to cooperate fully to resolve any issues on a commercial basis with a view to agreeing a mutually acceptable resolution. Notwithstanding the above, if either Party is still unable to fulfill its obligations under the Delivery Schedule, that Party shall be obliged to use best efforts to so comply.

**8. Price:**    CFR Port Neches, TX(US$/mt) = USG CP + Premium

Where:
"Premium" shall be:
    5 cents/pound in 2012
    8 cents/pound in 2013
    10 cents/pound in 2014

US BUTADIENE CP = US Gulf Settled Contract Price of BUTADIENE of the month of    loading as published by IHS Chemical in US$/mt

In the event that IHS Chemical changes its method of price posting for Butadiene, both parties will negotiate in good faith a mutually agreeable substitute posting.

**9. Purpose:**    Buyer binds itself to use the product·in Port Neches, USA to manufacture rubber and shall not be allowed to market or move the product in any manner or for any purposes whatsoever without Seller's formal, express consent.

**10. Inspection**    Inspection for quality and quantity to be performed by
**at Loading:**    independent surveyor mutually acceptable to both Buyer and Seller.

Quality will be final as determined by Static Shore tank

sample taken immediately prior of loading.
In case of transshipment, based on third-party inspection of vessel figures at load port.

Quantity will be final as determined by ship's figures at load port (vacuum) immediately after loading.

Fee for inspection at load port shall be paid by Seller, and inspection at discharge port shall be paid by Buyer.

**11. Credit Terms:**   Open credit

**12. Payment Terms:**   By telegraphic transfer to Seller's designated bank account of the full invoice amount, without deduction, offset or counterclaim, of immediately usable federal funds (in US dollars) no later than 30 days from Bill of Lading date (B/L date=day zero).

In the event of delay of the payment of the invoices, the sums owed by the Buyer shall bear a penalty calculated pro-rata per day at the rate of two percent (2%) per year.

**BENEFICIARY:**   **Sojitz Corporation of America**
Three Riverway, Suite 800
Houston, TX 77056

**BANK:**   **Bank of Tokyo Mitsubishi UFJ**
New York Branch

Account # : 610000748
SWIFT: BOTKU533
ABA: 026009632

**Export operator contact at Sojitz:**

Tadayuki Honda
e-mail : honda.tadayuki@sky.sojitz.com
tel : +1-713-966-5752

Dorothy Kuehn
e-mail : kuehn.dorothy@sky.sojitz.com
tel : +1-713-966-5756

All bank charges incurred at Buyer's bank when making a

payment of any amounts under this agreement shall be at Buyer's account and all bank charges incurred at Seller's bank shall be made at Seller's account.

**13. Maritime Conditions:** As per charter party, however ASBATANKVOY terms and conditions prevail.
Seller has the option to do transshipment.

All performing vessels nominated have to be in accordance with the dimensions of the discharge ports/berths.

**14. Demurrage:** Demurrage Rate Per Day to be nominated as per Charter Party and Asbatankvoy rules.

Seller cannot be responsible for additional costs or demurrage at public terminal if such terminal is nominated by Buyer. Demurrage occurred due to time spent waiting berth at public terminal will be for Buyer's account.

Seller to submit any demurrage claim together with Supporting Documents no later than 90 days after completion of discharge, otherwise the demurrage claim is considered waived. Buyer shall reply with its agreement or disagreement with calculations no later than 30 days after Seller's claim have being sent. After those 30 days above, Seller will consider the demurrage claim accepted and will issue invoice. The undisputed amount of the demurrage is to be paid within 30 days of invoice. Failure of Buyer to pay undisputed amounts of original invoice constitutes waiver of Buyer´s right of dispute and agreement by Buyer of the original invoice. Any portion remaining unpaid beyond the 30 days period, shall incur interests from the date of the invoice at rate of two percent (2%) per year.

The Supporting Documents shall consist of Notice of Readiness; Statement of Facts; Laytime Statement; Seller Calculation.

**15. Title and Risk of Loss:** Title and risk of loss or damage to the goods shall both pass from Seller to Buyer at the load port as material passes the ingoing flange of the vessel.

**16. Incoterms:** ICC 2010



17. Insurance:           Insurance will be covered by Buyer once goods have
                         passed the ship's rail in the port of shipment as per agreed
                         INCOTERM.

18.                      For each lot of Product produced and shipped by Seller to
Limitation of Liability  Buyer, Seller will provide to Buyer data from an
                         independent loadport analysis as to the Product's
                         specifications. In the event that Buyer becomes aware of
                         any Product damage or defect after loading, Buyer shall
                         give Seller prompt notice of any such damage or defect
                         that Buyer finds. The conditions of any independent test
                         for conformance with specifications shall be mutually
                         agreed upon and Seller may be represented at all such
                         tests.  If any Product is determined not to conform to the
                         warranty set forth in Article 24 below, then Seller shall
                         replace the defective Product and reimburse Buyer for
                         commercially reasonable direct costs incurred by Buyer in
                         connection with its storage and disposal of said defective
                         Products. In no event shall either party be liable to the
                         other for any special, consequential, incidental, exemplary
                         or indirect losses or damages.

19. Force                No Party shall be held accountable for its failure to perform
Majeure:                 its obligations under this Agreement for reason of force
                         majeure or unexpected events.

                         "Force Majeure" for the purposes of this Agreement shall
                         mean any occurrence arising from contingencies,
                         circumstances or causes outside the control of a Party and
                         which, by the exercise of reasonable diligence, that Party
                         is unable to prevent or remedy, including but not limited to,
                         the following circumstances, to the extent that they satisfy
                         the foregoing criteria: accident, mechanical breakdown of
                         facilities, inability to obtain fuel, power, supplies, raw
                         materials, fire, explosion, flood, strike, labor dispute,
                         lockout, riot, revolt, war (whether declared or not)  acts of
                         terrorism, acts of governmental or regulatory authority or
                         acts of God.  There shall be no requirement by either
                         Party to settle labor disputes.

                         If either Party is unable to perform any of its obligations
                         under this Agreement due to Force Majeure or if either
                         Party considers it likely that it may become so unable then
                         that Party shall as soon as possible notify the other Party
                         of the estimated extent and duration of such inability and
                         the steps being taken to minimize its effect.

Whenever the Parties shall deem necessary to call upon the reasons referred to in item above, they shall notify the other Party in writing in not more than eight (8) days after the occurrence, to establish and justify the reasons and nature of Force Majeure

**20. Entire Agreement:** Notwithstanding anything contained in any other agreement to the contrary, this agreement supersedes all prior representations, arrangements, understandings and agreements between the parties (whether written or oral) relation to the subject matter hereof and sets forth the entire complete and exclusive agreement and understanding between the parties hereto relating to the subject matter hereof.

**21. Arbitration:** Any dispute arising out of or in connection with this agreement, including any question regarding its existence, validity or termination shall be referred to and finally resolved by arbitration under the International Chamber of Commerce ("ICC") rules, which rules are deemed to be incorporated by reference herein. The number of arbitrators shall be three (3). The seat or legal place of arbitration shall be London, England. The language to be used in the arbitral proceedings shall be English. The arbitration award shall be binding on the Parties. Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the relevant Party or its assets.

**22. Governing Law:** This agreement shall be governed and construed in accordance with English Law. The United Nations Convention on contracts of the International sale of goods shall not apply to this contract.

**23. Assignment:** Either Party may assign its rights and/or obligations to an Affiliate and/or to a third party purchasing all or substantially of the asset of the business to which this Agreement relates, but neither Party may otherwise assign its rights and/or its obligations without the prior written consent of the other Party (which shall not be unreasonably withheld). If any rights and/or obligations under this Agreement are assigned, the assignor and assignee shall be jointly obliged to confirm the assignment in writing to the counterparty.

**24. Warranties**:        Seller warrants that the material conforms, within any tolerances stated, to the Specifications set forth on Appendix I. Except as set forth in the preceding sentence and except for the warranty of title, no conditions or warranties express or implied, of satisfactory quality, fitness of suitability of the material for any particular purpose or otherwise, are made by Seller.

**25. Confidentiality:**     All terms and other elements of this agreement are to be kept private and confidential by the parties save in the circumstances of dispute in which case the terms and other elements of this agreement may be disclosed to the arbitrators and parties' respective legal advisors.

**26. General:**        All taxes at loading port shall be for the account and care of Seller and at unloading port for the account and care of Buyer.

**ISP SYNTHETIC ELASTOMERS LLC**
Robert M. Frick
Vice President, Global Purchasing

**SOJITZ CORPORATION OF AMERICA**
Masami Ogura
General Manager

Appendix I – Quality

## BUTADIENE SPECIFICATION

| CHARACTERISTICS | UNIT | VALUE | REFERENCE |
|---|---|---|---|
| Purity | % wt | 99,5 min. | Calculate |
| Butanes e Butenes | % wt | 0,5 max. | ASTM-D-2593 |
| Butadiene 1,2 | ppm wt | 25   max. | ASTM-D-2593 |
| Total Acetylenes | ppm wt | 20   max. | ASTM-D-2593 |
| Propadiene | ppm wt | 15 max. | ASTM-D-2593 |
| Hydrocarbons C5+ | ppm wt | 500 máx. | ASTM-D-2593 |
| Carbonyls Compounds (as Acetaldeyde) | ppm wt | 15 máx. | ASTM 4423 |
| Non volatile residue | ppm wt | 500 máx. | ASTM D1025 |
| Peroxide (as active Oxygen) | ppm wt | 10   máx. | ASTM-E-298 |
| TBC | ppm wt | 50 -150 | ASTM-D-1157 |
| Total Sulphur | ppm wt | 5,0 máx. | ASTM-D-6667 or 3246 |
| Methanol | ppm wt | 10 max | D-2593 or 4864 |
| Appearance | | Clear & free of entrained material | |
| Oxygen content of vapor over liquid Butadiene | Vol % | 0,3 % | Oxygen analyzer |
| Dimers | ppm wt | 1000 máx. | ASTM-D-2426 |



**INTERNATIONAL COURT OF ARBITRATION®** | **INTERNATIONAL CENTRE FOR ADR** | LEADING DISPUTE RESOLUTION WORLDWIDE

24 May 2016/ja/ub

**21962/RD**

SOJITZ CORPORATION OF AMERICA (U.S.A.) vs/ ASHLAND, INC. (U.S.A.)

| **Counsel in charge of the file: Rocío Digón** | (Tel: | **+1 646 699 5704)** |
|---|---|---|
| **Deputy Counsel: Ulyana Bardyn / Marek Krasula / Camille M. Ng** | (Tel: | +1 646 699 5707 / 5706 / 5714) |
| | (Fax: | **+1 212 221 1295)** |
| | (Email: | **ica9@iccwbo.org)** |

ASHLAND, INC.
50 E. Rivercenter Blvd.
Covington, KY 41011
U.S.A.

*By FedEx*

Dear Sir,

The Secretariat of the International Court of Arbitration of the International Chamber of Commerce ("Secretariat") notifies you that, on 20 May 2016, it received a Request for Arbitration ("Request") from:

SOJITZ CORPORATION OF AMERICA
3 Riverway, Suite 800
Houston, TX 77056
U.S.A.

represented by:

Messrs. Neil Quartaro / Zachary Farley
WATSON, FARLEY & WILLIAMS
250 West 55th Street
New York, NY 10019
U.S.A.

Tel:  +1 212 922 2200
Fax: +1 212 922 1512

Email: nquartaro@wfw.com
        zfarley@wfw.com

that names you as Respondent.

.../...

INTERNATIONAL CHAMBER OF COMMERCE (ICC)
INTERNATIONAL COURT OF ARBITRATION

www.iccarbitration.org

| HEADQUARTERS | ASIA OFFICE | NORTH AMERICA OFFICE |
|---|---|---|
| 33-43 avenue du Président Wilson | Suite 2, 12/F Fairmont House | in affiliation with Sicana, Inc. |
| 75116 Paris | 8 Cotton Tree Drive | 1212 Avenue of the Americas |
| France | Central, Hong Kong | New York, NY 10036, USA |
| T +33 (0)1 49 53 29 05 | T +852 3607 5600 | T +1 646 699 5704 |
| F +33 (0)1 49 53 29 33 | F +852 2523 1619 | F +1 212 221 1295 |
| E arb@iccwbo.org | E ica8@iccwbo.org | E ica9@iccwbo.org |

Pursuant to Article 4(2) of the ICC Rules of Arbitration ("Rules"), this arbitration commenced on that date.

The caption and reference of this arbitration are indicated above. Please include the reference 21962/RD in all future correspondence.

In all future correspondence, any capitalized term not otherwise defined will have the meaning ascribed to it in the Rules and references to Articles of the Rules generally will appear as: "(Article ***)".

We enclose a copy of the Request and the documents annexed thereto (Article 4(5)).

**Answer to the Request**

Your Answer to the Request ("Answer") is due within **30 days** from the day following your receipt of this correspondence (Article 5(1)).

Please send us **five** copies of your Answer, together with an electronic version.

You may apply for an extension of time for submitting your Answer by nominating an arbitrator (Article 5(2)). Such information will enable the International Court of Arbitration of the International Chamber of Commerce ("Court") to take steps towards the constitution of the arbitral tribunal.

If any of the parties refuses or fails to take part in the arbitration or any stage thereof, the arbitration will proceed notwithstanding such refusal or failure (Article 6(8)).

**Joinder of Additional Parties**

No additional party may be joined to this arbitration after the confirmation or appointment of any arbitrator, unless all parties including the additional party otherwise agree (Article 7(1)). Therefore, if you intend to join an additional party and seek an extension of time for submitting your Answer, please inform us in your application for such extension.

**Constitution of the Arbitral Tribunal**

The arbitration agreement provides for three arbitrators. Claimant has nominated Mr. Bob Deering as a co-arbitrator.

We will invite the prospective arbitrator to complete a Statement of Acceptance, Availability, Impartiality and Independence, which we will send to all parties.

You are required to nominate a co-arbitrator in your Answer or in any request for an extension of time for submitting your Answer (Article 12(4)). If you fail to nominate an arbitrator within **30 days** from the day following your receipt of this correspondence, the Court will appoint an arbitrator on your behalf (Article 12(4)).

The Court will appoint the president, unless the parties agree upon another procedure (*e.g.,* the co-arbitrators nominating the president) (Article 12(5)).

**Financial Consequences of a Three-Member Arbitral Tribunal**

Having three arbitrators increases the arbitral tribunal's fees and expenses (*e.g.*, travel and hotel expenses). The Cost Calculator (available on the Court's website www.iccarbitration.org) provides the following amounts as estimated fees:

| | |
|---|---|
| One arbitrator: | US$ 20 373 |
| Three arbitrators: | US$ 61 119 |

If the parties agree to have one arbitrator, please inform us as soon as possible.

.../...

**Place of Arbitration**

The arbitration agreement provides for London (United Kingdom) as the place of arbitration.

**Language of Arbitration**

The arbitration agreement provides for English as the language of arbitration.

**Representation**

If you are represented by counsel, please provide the relevant contact details.

**Communication with the Secretariat**

Please provide your email addresses (or fax numbers if email is not available), as the Secretariat generally transmits correspondence by email.

**Efficient Conduct of the Arbitration**

The Rules require the parties and the arbitral tribunal to make every effort to conduct the arbitration in an expeditious and cost-effective manner having regard to the complexity and value of the dispute (Article 22(1)).

In making decisions as to costs, the arbitral tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner (Article 37(5)).

**Amicable Settlement**

Parties are free to settle their dispute amicably at any time during an arbitration. The parties may wish to consider conducting an amicable dispute resolution procedure pursuant to the ICC Mediation Rules, which, in addition to mediation, also allow for the use of other amicable settlement procedures. ICC can assist the parties in finding a suitable mediator. Further information is available from the ICC International Centre for ADR at+33 1 49 53 30 53 or adr@iccwbo.org or www.iccadr.org.

**Your Case Management Team**

For any information about this file, please do not hesitate to contact:

| | |
|---|---|
| Ms. Rocío Digón, Counsel | (direct dial number: +1 646 699 5704) |
| Mr. Marek Krasula, Deputy Counsel | (direct dial number: +1 646 699 5706) |
| Ms. Ulyana Bardyn, Deputy Counsel | (direct dial number: +1 646 699 5707) |
| Ms. Camille M. Ng, Deputy Counsel | (direct dial number: +1 646 699 5714) |
| Ms. Jennifer Anderson, Assistant | (direct dial number: +1 646 699 5716) |
| Ms. Patricia Despagne, Assistant | (direct dial number: +1 646 699 5712) |
| Mr. Liman Oseni, Assistant | (direct dial number: +1 646 699 5709) |
| Fax number | +1 212 221 1295 |
| Email address | ica9@iccwbo.org |

While maintaining strict neutrality, we are at the parties' disposal regarding any questions they may have concerning the application of the Rules.

.../...

**21962/RD**                                                                                                  **Page 4**

Please find enclosed a note that highlights certain key features of ICC arbitration.

Finally, we invite you to visit our website at www.iccarbitration.org to learn more about our Dispute Resolution services.

Yours faithfully,

Rocío Digón
Counsel
International Court of Arbitration® | International Chamber of Commerce
SICANA Inc.

encl.      - All correspondence exchanged to date
           - Request for Arbitration with documents annexed thereto
           - ICC Rules of Arbitration *(see also www.iccarbitration.org)*
           - Note to Parties and Arbitral Tribunals on the Conduct of the Arbitration under the 2012
             ICC Rules of Arbitration

c.c.       Messrs. Neil Quartaro / Zachary Farley *(By email: nquartaro@wfw.com / zfarley@wfw.com)*
           *(without enclosures)*

# EXHIBIT 2

**Zachary Farley**

| | |
|---|---|
| **From:** | David Steward <David.Steward@arb10fs.com> |
| **Sent:** | Thursday, December 22, 2016 3:06 AM |
| **To:** | deKlerk, Andrew S.; Neil Quartaro; Zachary Farley; poleary@frilot.com |
| **Cc:** | ica9; bob.deering@bdmlawllp.com; Nigel Jacobs QC; DIGON Rocio; Krasula Marek; NG Camille; Vera Holmes |
| **Subject:** | Re: ICC Case 21962/RD: SOJITZ CORPORATION OF AMERICA (U.S.A) vs/ ASHLAND INC., formerly ISP Synthetic Elastomers L.L.C. (U.S.A.) |

We thank the parties for their letter dated 14 December and email of 20 December. In the light of these, and in order that the Tribunal can consider how to proceed, please will Watson, Farley & Williams let us know the likely time frame for the third parties to respond to an order of the US court: in other words, (1) whether an application has been made so far; (2) how long it is likely to take to obtain an order; and (3) how long the third parties are likely to be given within which to produce any documents which they may have?  We would be very grateful for that information at the earliest convenient time.

Kind regards
David Steward
For the Tribunal

On 20 Dec 2016, at 23:08, deKlerk, Andrew S. <AdeKlerk@frilot.com> wrote:

> Dear Sirs,
>
> We refer to the Watson, Farley & Williams letter dated December 14, 2016 which we have discussed with our clients.
>
> Ashland's position remains that they are unaware of any general average adjustment, and deny that any such adjustment would have any application in this type of case concerning parties' obligations under a CFR sales contract. Nevertheless, Ashland has no objection to Sojitz's attempt to take discovery from third parties if that is what they wish to do and if the Tribunal allows it, so long as it does not impact the procedural timetable currently in place.
>
> Respectfully,
> Andrew de Klerk
> Patrick O'Leary
>
> Andrew S de Klerk ~ Frilot LLC
> 1100 Poydras Street  Suite 3700, New Orleans, La. 70163
> Ph +1 504 5998010  Mob +1 504 4425927  Email adeklerk@frilot.com

**From:** David Steward [mailto:David.Steward@arb10fs.com]
**Sent:** Thursday, December 15, 2016 4:40 AM
**To:** Neil Quartaro; zfarley@wfw.com; deKlerk, Andrew S.; Oleary, Patrick
**Cc:** ica9; bob.deering@bdmlawllp.com; Nigel Jacobs QC; DIGON Rocio; Krasula Marek; NG Camille; Vera Holmes
**Subject:** Re: ICC Case 21962/RD: SOJITZ CORPORATION OF AMERICA (U.S.A) vs/ ASHLAND INC., formerly ISP Synthetic Elastomers L.L.C. (U.S.A.)

1

Dear colleagues

We acknowledge receipt of Watson Farley & Williams' message and attachment. In order that we may consider the position, we ask for the Respondent's comments in response to that message by latest 5pm in London on Wednesday 21 December.

Thanks and regards
David Steward
For the Tribunal

On 15 Dec 2016, at 01:06, Neil Quartaro <NQuartaro@wfw.com> wrote:

> Dear Tribunal,
>
> Please see the attached correspondence.
>
> **NEIL QUARTARO**
> Counsel
>
> Watson Farley & Williams LLP
> 250 West 55th Street | New York | New York 10019
> T +1 212 922 2200 | D +1 212 922 2214 | M +1 917 370 6933
> E-mail | Website | vCard
>
>
> **From:** David Steward [mailto:David.Steward@arb10fs.com]
> **Sent:** Monday, December 12, 2016 5:57 AM
> **To:** ica9 <ica9@iccwbo.org>
> **Cc:** bob.deering@bdmlawllp.com; Nigel Jacobs QC
> <Nigel.Jacobs@quadrantchambers.com>; Neil Quartaro <NQuartaro@wfw.com>;
> Zachary Farley <zfarley@wfw.com>; adeklerk@frilot.com; poleary@frilot.com; DIGON
> Rocio <Rocio.DIGON@iccwbo.org>; Krasula Marek <Marek.Krasula@iccwbo.org>; NG
> Camille <Camille.NG@iccwbo.org>; Vera Holmes <vmholmes@ashland.com>
> **Subject:** ICC Case 21962/RD: SOJITZ CORPORATION OF AMERICA (U.S.A) vs/ ASHLAND
> INC., formerly ISP Synthetic Elastomers L.L.C. (U.S.A.)
>
> I acknowledge with thanks safe receipt of your letter of 9 December 2016, attached to
> the email below.
>
> With kind regards
> David Steward
>
> On 10 Dec 2016, at 01:17, ica9 <ica9@iccwbo.org> wrote:
>
>> Dear Sirs,
>>
>> Please see the attached.
>>
>> Yours faithfully,
>>
>> Patricia Despagne | Assistant

2

International Court of Arbitration ® International Chamber of Commerce
SICANA Inc. | 1212 Avenue of the Americas, 9th floor, New York, NY
10036
Tel: 1-646-699-5712 Email: patricia.despagne@iccwbo.org
| www.iccarbitration.org

-----------------------------------------------------------------------
This message is confidential. If you have received this message in error,
please delete it and notify the sender. You should not retain this
message or disclose its contents to anyone.
-----------------------------------------------------------------------

<21962 RD 9 December 2016.pdf>

<116121501064700659.gif>

This email is from the offices of Watson Farley & Williams LLP, 250 West 55th Street, New York, New York 10019
Tel: +1-212-922-2200 http://www.wfw.com.

Any reference to a 'partner' means a member of Watson Farley & Williams LLP, or a member or partner in an affiliated
undertaking, or an employee or consultant with equivalent standing and qualification.

If this communication is capable of having an effect in the United Kingdom, you should be aware that we are not
authorized by the Financial Services Authority under the Financial Services and Markets Act 2000 but we are
authorized and regulated by the Solicitors Regulation Authority and we can undertake certain activities in relation to
investments which are limited in scope and incidental to our legal services or which may reasonably be regarded as a
necessary part of our legal services.

This e-mail is confidential and may be privileged. If you are not the intended addressee, (i) you should not read the
contents of this e-mail or any attachments, disclose them to any other person or use them in any way, and (ii) please
delete this e-mail and any attachments from your system and notify the sender immediately.

**We are aware of fraudulent correspondence involving the firm's name. If you receive an email that appears to
come from Watson Farley & Williams LLP or any of its affiliated entities indicating a change of bank details
and/or if you have any doubts about whether the communication is genuine please do not reply to the email
and contact us immediately. We will not accept responsibility if you transfer money into an incorrect account
as a result of fraudulent communication.**

<Scan File.pdf>

# EXHIBIT 3



Assured:      Ashland, Inc.
Policy No:    015914339
Period:       12:01 a.m. PST February 1, 2013 to January 1, 2014 12:01 a.m. PST

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from the AIG companies.  AIG insurance companies generally pay
compensation to brokers and independent agents, and may have paid compensation in connection with your
policy.  You can review and obtain information about the nature and range of compensation paid by AIG
insurance companies to brokers and independent agents in the United States by visiting our website at
www.aig.com/producercompensation or by calling 1-800-706-3102.

# DECLARATION PAGE OF MARINE/WAR CARGO

*This Declaration of Insurance replaces all previously issued Declaration Pages and amends the terms and conditions of this policy from the date of attachment shown below.*

| | | | |
|---|---|---|---|
| **THE INSURED** (Clause 1) | Ashland, Inc. / International Specialty Products, Inc. 50 E. RiverCenter Blvd. Covington, KY 41012-0391 | **POLICY NO:** | 015914339 |
| | | **Date Issued:** | February 1, 2013 |

| | |
|---|---|
| **INTEREST INSURED** (Clause 3) | All shipments and/or merchandise consisting primarily of Liquid Chemicals in ISO tanks, Liquid Chemical in Bulk, dry or liquid chemicals in drums or bags of customary packaging, Petroleum Products, Animal and Vegetable oils, and General merchandise incidental to the business of the Assured, except to the extent coverage is prohibited by United States of America law or United States of America governmental decree, freight and all other interests incidental to the Assured's business.  Loss or not lost, by any conveyance including any connecting conveyances between ports and/or places throughout the world, including transshipment. |
| | Also covered are household goods and personal effects and automobiles of the Assureds Employees, Machinery and office equipment, when shipped for repair, overhaul and return. |
| **ATTACHMENT AND CANCELLATION** (Clause 4) | Effective February 1, 2013 to January 1, 2014 12:01 a.m. PST and continuous until cancelled. |
| **PREMIUM** (Clause 8) | Minimum and deposit premium of $124,440 (based on estimated sales of $7,794,036,915 for the 11-month policy period), adjustable against a policy rate of .0016% in the event that sales exceed estimate given by 10%. |
| | Terrorism Risk Insurance Act (TRIA) included in above premium. |
| | <u>Pro-Rata Premium Breakdown:</u> |
| | $113,940    U.S. Premium -- invoiced in the U.S.<br>$  10,500    Australia Local Policy -- invoiced locally.  Premium is inclusive of taxes, fees and other legislatively required charges.<br>$124,440*   Total Pro-Rata Net Premium (11-month policy term)<br>* Annual premium $136,000 ($124,500 U.S. / $11,500 Australia) |
| **VALUATION** (Clause 9) | <u>Transit</u> – As Per Clause 9 of this Policy<br>Customer Sales – the total amount of the invoice to the consignee of the insured shipment (including all charges invoiced therein), plus all charges not included in such invoice, including any prepaid or advanced or guaranteed freight, if any, plus 25% until declared and then at the amount declared, provided such declaration is made prior to any known or reported loss or accident, but in no event to be less than the foregoing. |
| | Inter-Company Sales – the total amount of the invoice issued to the consignee of the insured shipment (including all charges invoiced therein), plus all charges not included in such invoice, including any prepaid or advanced or guaranteed freight, if any, plus 25%. |
| | <u>Personal Effects and Used Automobiles</u><br>Valued as per valued inventory made prior to shipments, otherwise valued at Actual Cash Value. |

ASHLAND 0035

Page 2

| LIMITS OF LIABILITY | Transit | |
|---|---|---|
| | $ 15,000,000 | Per vessel / aircraft / connecting conveyance or at any one time or place; including War Risk |
| | $ 5,000,000 | For any one Inland Transit |
| | $ 5,000,000 | Per any one Barge or Tow, except as a connecting conveyance |
| | $ 1,000,000 | Per ON DECK shipment, subject to an ON DECK Bill of Lading |
| | $ 25,000 | For any one package shipped by mail or parcel post |
| | $ 25,000 | For any one messenger as a connecting conveyance |
| | $ 25,000 | Exhibition |
| | $ 5,000 | Salesperson Samples |
| DEDUCTIBLE | $25,000 | Any one occurrence or series of occurrences arising out of one event, with the exception of General Average & Salvage Charges which are payable in full; but |
| | $ 1,000 | in respect of consolidation risks |
| | $ 1,000 | in respect of exhibition risks (per Clause 59.1) |
| | $ 1,000 | in respect of additional expense coverage (to be agreed) |
| | $ 1,000 | in respect of Salesperson samples (per Clause 59.2) |
| | Normal or Trade Loss / Shortage in excess of ½ of 1% - In respect of Bulk Shipments | |
| CONDITIONS OF INSURANCE (Clause 16) | All Risks including the risks of War, SR & CC (Form 12A), including Guaranteed Outturn | |
| ADDITIONAL COVERAGES | S.R.&C.C. Endorsement (Form 12A) AIMU Extended Radioactive Contamination Exclusion Clause with U.S.A Endorsement AIMU Chemical, Biological, Bio-Chemical, Electromagnetic Weapons and Cyber Attack Exclusion Clause (U.S.A.) U.S. Economic and Trade Sanctions Clause Extra Expense Extension Endorsement – Refer to End. No. 1 Contingent / DIC / DIL Coverage (local policies) – Refer to End. No. 2 25% Profit Sharing – Refer to End. No. 3 Bulk Shipments including Guaranteed Outturn – Refer to End. No. 4 | |
| RATES | 0.0016% on Worldwide Gross Annual Company Sales of $8,502585,727 | |
| BROKER COMMISSION | NIL | |
| INSURANCE BROKER | Marsh Risk & Insurance Services 777 South Figueroa Street Los Angeles, California 94111 California Insurance License 0437153 | |

As per authority granted National Union Fire Insurance Company of Pittsburgh, PA

By _____

Authorized Signature/Date

THE INSURANCE COMPANY SIGNATORY HERETO
(HEREINAFTER CALLED "THIS INSURER")
BY THIS POLICY OF MARINE CARGO INSURANCE
IN CONSIDERATION OF PREMIUM AS AGREED
DOES INSURE

"As Per Declaration Page"

and its Subsidiary, Associated, Affiliated and
Interrelated Companies and Joint Ventures in
which it has now or may have a direct or indirect
interest and other entities for whom they may have
instructions to insure or deem themselves responsible to insure.

(HEREINAFTER REFERRED TO AS "THE INSURED")

1

ASHLAND 0037

# TABLE OF CONTENTS

**MARINE CARGO POLICY**

| Clause No. | Caption |
|---|---|
| 14 | Accumulation Clause |
| 59 | Additional Coverage(s) / Special Conditions |
| 18 | Application of Warehouse to Warehouse and Marine Extension Clause |
| 4 | Attachment and Cancellation |
| 21 | Both to Blame |
| 25 | Brands and Trademarks |
| 63 | Captions |
| 46 | Carrier or Bailee |
| 30 | Concealed Damage |
| 16 | Conditions of Coverage |
| 54 | Constructive Total Loss |
| 42 | Contingent Interest/Unpaid Vendors |
| 28 | Control of Damaged Goods and/or Merchandise and/or Property |
| 5 | Conveyances |
| 6 | Craft, Etc. |
| 33 | Debris Removal |
| 10 | Declaration of Interest Insured |
| 13 | Deductible |
| 45 | Delay |
| 23.1 | Deliberate Damage- Pollution Hazard |
| 23.2 | Deliberate Damage- Services |

ASHLAND 0038

## TABLE OF CONTENTS

**MARINE CARGO POLICY**

| Clause No. | Caption |
|---|---|
| 36 | Demurrage Charges |
| 41 | Difference in Conditions |
| 15 | Duty, Taxes, Etc. |
| 11 | Errors and Omissions |
| 38 | Expediting Cost |
| 47.1 | F.C&S. Warranty |
| 40 | F.O.B., F.A.S, C.&F. Shipments |
| 35 | Fraudulent Bills of Lading |
| 31 | General Average |
| 7 | Geographical Limits |
| 23 | Governmental Damage |
| 43 | Guarantee of Collectibility |
| 34 | Increased Values and/or Profits |
| 32 | Insufficiency of Packing Clause |
| 66 | Insurable Interest |
| 3 | Interest Insured |
| 22 | Interruption of Transit |
| 26 | Labels |
| 37 | Landing, Warehousing |
| 49 | Letter of Credit |
| 12 | Limits of Liability |
| 19 | Loading/Unloading |

3

ASHLAND 0039

## TABLE OF CONTENTS

**MARINE CARGO POLICY**

| Clause No. | Caption |
|---|---|
| 2 | Loss Payee |
| 24 | Machinery |
| 48 | Negligence |
| 60 | Non-Admitted Insurance – Tax Clause |
| 52 | Notice of Loss |
| 47.3 | Nuclear Exclusion |
| 55 | Other Insurance |
| 27 | Pair and Sets |
| 47 | Paramount Warranties |
| 53 | Partial Loss |
| 57 | Payment of Account |
| 56 | Payment of Loss |
| 65 | Perils |
| 69 | Policy Number |
| 62 | Precedence of Conditions |
| 8 | Premium |
| 51 | Protection of Suit |
| 20 | Recoopering/Repacking |
| 39 | Refused or Returned Shipment |
| 68 | Required by Law |
| 47.2 | S.R.&C.C Warranty |
| 29 | Shortage of Contents |

4

ASHLAND 0040

## TABLE OF CONTENTS

**MARINE CARGO POLICY**

| Clause No. | Caption |
|---|---|
| 70 | Signature of This Insurer |
| 58 | Subrogation |
| 61 | Substitution |
| 44 | Sue and Labor |
| 64 | Suit Against Insurer |
| 1 | The Insured |
| 9 | Valuation |
| 67 | Waiver of Survey |
| 50 | Waiver and/or Release |
| 17 | Warehouse to Warehouse and Marine Extensions Clause |

**ENDORSEMENTS:**

| | S.R.&C.C. Endorsement (Form 12A) |
|---|---|
| | AIMU Extended RACE Clause Endorsement (March 1, 2003) |
| | AIMU Chemical, Biological, Bio-Chemical, Electromagnetic Weapons and Cyber Attack Exclusion Clause (March 1, 2003) |
| | U.S. Economic and Trade Sanctions Clause |
| No. 1 | Extra Expense Endorsement |
| No. 2 | Contingent / DIC / DIL Coverage Endorsement |
| No. 3 | 25% Profit Sharing |
| No. 4 | Bulk Chemical Clauses (SP-13C) |

ASHLAND 0041

# TABLE OF CONTENTS

**MARINE CARGO POLICY**

**Clause No.**    **Caption**


**SCHEDULE OF RATES**


**WAR RISKS POLICY**

6

ASHLAND 0042

1.  **THE INSURED:**

    **"As Per Declaration Page"** and its subsidiary, associated, affiliated and interrelated companies, and joint ventures in which it now has or hereafter may have a direct interest and other entities for whom they may have instructions to insure or deem themselves responsible to insure, as their respective interests may appear (hereinafter referred to as "The Insured").

2.  **LOSS PAYEE:**

    **PROCEEDS, IF ANY, PAYABLE TO THE INSURED OR ORDER.**

3.  **INTEREST INSURED:**

    3.1   The interests insured under this policy are (i) goods and/or merchandise and/or property of every description consisting principally of, but not limited to, **"As Per Declaration Page"**

    and including prepaid freight, advanced freight, guaranteed freight and freight payable "vessel lost or not lost," under or on deck, shipped by or consigned to The Insured, its agents or others, (ii) The Insured's own goods and/or merchandise and/or property and (iii) goods and/or merchandise and/or property of others in which The Insured may have an interest.

    3.2   Also, to cover all shipments of goods and/or merchandise and/or property made for the account of others which the Insured agrees or receives instructions or is under obligation (whether by arrangements, understandings, agreements or otherwise) or has a right to insure.

4.  **ATTACHMENT AND CANCELLATION:**

    This policy is continuous and covers all shipments of goods and/or merchandise and/or property made on/or and after 12:00 A.M. **"As Per Declaration Page"** and on all goods and/or merchandise and/or property at locations on and after said time and date, unless canceled by giving The Insured 60 days notice in writing or by The Insured stating when such cancellation shall be effective. Such cancellation, however, is not to prejudice any coverage which had attached prior to the cancellation date designated in such notice except that coverage on goods and/or merchandise and/or property at locations shall terminate on the designated cancellation date, provided proper notice has been given.

5.  **CONVEYANCES:**

    5.1   This policy covers all shipments made by vessel, barge, and/or air conveyance, including shipments by mail and parcel post, messengers and couriers and/or otherwise, and all connecting conveyances.

7

ASHLAND 0043

**5.2** Wherever the words "ship," "vessel," "seaworthiness," "ship owner," or "vessel owner" appear in this policy, they are deemed to include also the words "aircraft," "airworthiness," and "aircraft owner."

**6.  CRAFT, ETC.:**

**6.1** Coverage under this policy includes the risk by craft, raft and/or lighter to and from the vessel. Each craft, raft and/or lighter to be deemed separately insured. Also to cover any special or supplementary lighterage to take the goods and/or merchandise and/or property to and from the warehouse.

**6.2** The Insured is not to be prejudiced by any agreement exempting lightermen from liability.

**7.  GEOGRAPHICAL LIMITS:**

This policy covers while at and from ports and/or places in the world to, and at, ports and/or places in the world, including the risk of transshipment by land, air, water, or otherwise, unless prohibited by United States of America law or United States of America governmental decree.

**8.  PREMIUM:**

The consideration for all of the coverages provided in this policy, including contingent and extended coverages, unless otherwise agreed, is the premium payable for the primary coverage, as agreed.

**9.  VALUATION:**

**9.1** Unless specifically provided for elsewhere in this policy including the Declaration Page attached to this policy, or instructions to the contrary are given or received by The Insured, the goods and/or merchandise and/or property insured under this policy shall be valued at the total amount of the invoice issued to the consignee of the insured shipment (including all charges invoiced therein), plus all charges not included in such invoice, including any prepaid or advanced or guaranteed freight, if any, plus 25% until declared and then at the amount declared, provided such declaration is made prior to any known or reported loss or accident, but in no event to be less than the foregoing.

**9.2** Insured goods and/ or merchandise and/or property shipped free of charge, or for an amount not reflective of their actual value, to or from The Insured shall be valued at replacement cost (new for old), whether or not actually replaced.

8

ASHLAND 0044

( )

**9.3**   Used goods and/ or merchandise and/or property shall be valued at replacement value with like kind and quality. If unable to be replaced with like kind and quality the replacement cost of items similar to the damaged property and intended to perform the same function, but may include improvements or advances.

**9.4**   Privilege is granted to The Insured to insure in foreign currencies.  When the privilege is exercised, the proceeds paid under this policy are payable in the same currencies, however, at the option of The Insured, the proceeds are payable in United States dollars at the rate of exchange current on the date the above invoice was issued.

**10.**   **DECLARATION OF INTEREST INSURED:**

**10.1**   Unless otherwise specifically agreed, it is a condition of this policy that The Insured shall declare to Marsh Risk & Insurance Services, as brokers for The Insured, for transmission to This Insurer, as soon as practicable, copies of all certificates, special policies, declarations and endorsements for each and every shipment coming within the terms of this policy, whether arrived or not.

**10.2**   Authority is hereby given The Insured to issue and countersign This Insurer's certificates and special policies (including endorsements thereto) on any and all shipments insured under this policy, but only subject to the terms, conditions and warranties of this policy, it being understood and agreed that all certificates and special policies and endorsements must be countersigned by a duly authorized representative of The Insured in order to become binding on This Insurer. Shipments on which certificates or special policies are not required may be reported by special declaration forms furnished to The Insured.

**10.3**   Nothing in this Clause shall be deemed to require The Insured to declare to This Insurer shipments covered under the following clauses found elsewhere in this policy: (i) F.O.B., F.A.S., C&F Shipments, (ii) Difference in Conditions, (iii) Contingent Interest/Unpaid Vendors or (iv) Guarantee of Collectibility.

**11.**   **ERRORS AND OMISSIONS:**

This policy shall not be vitiated by any unintentional delay, error, omission or oversight in making any declaration that is required to be made under any provision contained in or endorsed on this policy provided a correct declaration is communicated to This Insurer as soon as practicable after the delay, error, omission or oversight becomes known to The Insured's corporate risk manager or equivalent, and premium paid, if required by This Insurer.

9

ASHLAND 0045

## 12.   LIMITS OF LIABILITY:

**12.1**   Unless otherwise agreed, This Insurer shall not be liable under this policy for more than **"As Per Declaration Page"** per any conveyance, connecting conveyance, craft or at any place at anytime.

**12.2**   If the total value at risk exceeds the limit of liability set forth in Sub-Clause 12.1, the principle of co-insurance is waived by This Insurer.

**12.3**   Nothing in Sub-Clause 12.2 shall be construed to amend the limit of liability set forth in Sub-Clause 12.1.

**12.4**   This Insurer shall pay in full claims for general average, salvage and special charges and for such expenses as are provided for in the Sue and Labor clause even though the sum insured may be less than the contributing value or actual value of the goods and/or merchandise and/or property insured under this policy.

**12.5**   The limit of liability of This Insurer with respect to the coverages provided for in the General Average, Landing and Warehousing and Duties, Taxes, Etc. clauses shall be separate from, and equal in amount and in addition to, the limit of liability set forth in Sub-Clause 12.1 and shall be separate from and in addition to any other limit(s) of liability set forth in this policy.

**12.6**   The limit of liability of This Insurer with respect to the coverage provided for in Sue and Labor charges shall be separate from, and in addition to, the limit of liability set forth in Sub-Clause 12.1 and shall be in proportion to the sum hereby insured, but in no event to exceed an amount equal to limit of liability set forth in Sub-Clause 12.1.

**12.7**   The limit of liability of This Insurer with respect to the coverage provided for in the Debris Removal clause shall be separate from and in addition to, the limit of liability set forth in Sub-Clause 12.1 and shall be separate from and in addition to any other limit(s) of liability set forth in this policy.

## 13.   DEDUCTIBLE:

**13.1**   A deductible of **"As Per Declaration Page"** shall apply to any one Loss; however, this deductible shall not apply to (i) survey fees, (ii) general average, salvage or special charges, (iii) loss, damage or expense arising from any FPA Perils, Shore Perils, Inchmaree Perils or Explosion Peril, as defined elsewhere in this policy, (iv) loss damage or expense covered under Sue and Labor, Constructive Total Loss or Debris Removal Clauses or the S.R. & C.C Endorsement (v) a total loss.

10

ASHLAND 0046

13.2   The deductible shall not be applied so as to reduce This Insurer's obligation to pay the full amount of any limit(s) of liability set forth in this policy.

14.   **ACCUMULATION CLAUSE:**

Should there be an accumulation of the interests insured hereunder beyond the limit(s) of liability expressed elsewhere in this policy by reason of any interruption of transit or circumstance beyond the control of The Insured's corporate risk manager or equivalent, or by reason of any casualty, or at a transshipping point, or on a connecting conveyance, This Insurer shall, provided notice of such accumulation is given to This Insurer as soon as practicable after it becomes known to The Insured's corporate risk manager or equivalent, hold covered such excess interest and shall be liable for the full amount at risk, but in no event shall This Insurer's liability exceed twice the limit of liability set forth in Sub-Clause 12.1.

15.   **DUTY, TAXES, ETC.:**

15.1   In addition to the limit(s) of liability set forth elsewhere in this policy, This Insurer agrees to pay duties, value added taxes (V.A.T.) and other charges paid by or which become due from The Insured with respect to shipments for which a claim is paid by This Insurer.

15.2   The Insured will, in all cases, use reasonable efforts to obtain abatement or refund of duties and other charges paid or claimed in respect of goods and/or merchandise and/or property lost, damaged or destroyed.

15.3   This insurance on duty, V.A.T. and other charges shall terminate at the end of the import movement covered under this policy (including the Warehouse to Warehouse and Marine Extension and the Loading/Unloading clauses) but nothing contained in this Clause shall alter or affect any coverage granted elsewhere in this policy during the storage or transit subsequent thereto.

16.   **CONDITIONS OF COVERAGE:**

16.1   Unless otherwise specified below, all goods, merchandise and property are insured:

Against all risks of physical loss or damage from any external cause, except those risks as may be excluded by the F.C. & S. warranty, S.R. & C.C. warranty and/or other warranties or exclusions specified in this policy, unless covered elsewhere herein, irrespective of percentage.

11

ASHLAND 0047

**16.1.2**      This Insurer is also to pay for any expense resulting from explosion, howsoever and wheresoever occurring, except explosions resulting from those risks as may be excluded by the F.C.&S. and the S.R. & C.C. warranties (this risk is referred to as the **"Explosion Peril"**).

**16.1.3**      This Insurer is also to pay for any expense resulting, while the goods and/or merchandise and/or property are on docks, wharves, quays or elsewhere on shore and during land transportation, from fire, smoke, sprinkler leakage, lightning, cyclone, hurricane, earthquake, windstorm, hail, landslide, volcanic eruption, flood, rising water, aircraft, objects falling from aircraft or collision, derailment or any accident to the conveyance or collapse or subsidence of docks, wharves, quays or structures (these risks are referred to as the **"Shore Perils"**).

**16.2**     The goods, merchandise and property listed below in Sub-Clause 16.2.6 are insured:

Against all risks of physical loss or damage from any external cause, except those risks as may be excluded by the F.C. & S. warranty, S.R. & C.C. warranty, or other warranties or exclusions specified in this policy, unless covered elsewhere herein, but warranted free of particular average unless the vessel or craft be stranded, sunk, burnt or in collision (these risks are referred to as the **"FPA Perils"**). Notwithstanding this average warranty, This Insurer is to pay for:

**16.2.1**      any physical loss of or damage to the goods and/or merchandise and/or property which may reasonably be attributed to fire or contact of the vessel and/or craft and/or conveyance with any external substance (ice included) other than water, or to the discharge of the goods and/or merchandise and/or property at a port of distress, and including jettison and washing overboard.

**16.2.2**      any physical loss of or damage to the goods and/or merchandise and/or property resulting from the bursting of boilers, breakage of shafts or from any latent defect in the machinery, hull or appurtenances of the vessel and/or craft and/or conveyance, or from faults or errors in the navigation or management of the vessel and/or craft by the master, mariners, engineers or pilots (these risks are referred to as the **"Inchmaree Perils"**),

**16.2.3**      any physical loss of or damage to the goods and/or merchandise and/or property or expense resulting from explosion, howsoever or wheresoever occurring, except explosions resulting from those risks as may be

12

ASHLAND 0048

excluded by the F.C.& S. and the S.R. & C.C. warranties specified in this policy,

**16.2.4**    any physical loss of or damage to the goods and/or merchandise and/or property caused by fumigation, resulting from the conveyance and/or location being fumigated by order of a properly constituted authority or otherwise,

**16.2.5**    any physical loss of or damage to the goods and/or merchandise and/or property or expense resulting, while the goods and/or merchandise and/or property are on docks, wharves, quays or elsewhere on shore and during land transportation, from fire, smoke, sprinkler leakage, lightning, cyclone, hurricane, earthquake, windstorm, hail, landslide, volcanic eruption, flood, rising water, aircraft, objects falling from aircraft or collision, derailment or any accident to the conveyance or collapse or subsistence of docks, wharves, quays or structures.

**16.2.6**    List of goods and/or merchandise and/or property: **Not applicable unless specified on "Declaration Page" attached hereto.**

**16.3**    Nothing in this Clause shall be construed to cover any loss, damage or deterioration arising out of delay or loss of market, unless otherwise specifically provided elsewhere in this policy.

**17.    <u>WAREHOUSE TO WAREHOUSE AND MARINE EXTENSION CLAUSE</u>:**

**17.1**    Notwithstanding anything to the contrary contained in or endorsed on this policy, it is understood and agreed that the following terms and conditions shall apply to all shipments:

**17.1.1**    This insurance attaches from the time the goods and/or merchandise and/or property leave the warehouse, store or other location at the place named in the policy, special policy, certificate or declaration for the commencement of the transit and continues until the goods and/or merchandise and/or property are delivered to the final warehouse, store or other location at the destination named in the policy, special policy, certificate or declaration, or a substituted destination as provided in Sub-Clause 17.1.3 below.

**17.1.2**    This insurance specially to cover the goods and/or merchandise and/or property, subject to the applicable

13

ASHLAND 0049

insuring terms, conditions and warranties set forth elsewhere in this policy, during,

(i)     deviation, delay, forced discharge, re-shipment and transshipment, and

(ii)    any other variation of the adventure arising from the exercise of a liberty granted to the shipowner or charterer under the contract of affreightment.

17.1.3    In the event of the exercise of any liberty granted to the shipowner or charterer under the contract of affreightment whereby such contract is terminated at a port or place other than the original insured destination, this insurance continues, subject to the applicable insuring conditions set forth elsewhere in this policy, until the goods and/or merchandise and/or property are sold and delivered at such port or place; or, if the goods and/or merchandise and/or property are not sold, but are forwarded to the original insured destination or to any other destination, this insurance continues until the goods and/or merchandise and/or property are delivered to the final warehouse, store or other location.

17.1.4    If, while this insurance is still in force and before the expiry of 15 days from midnight of the day on which the over the side discharge of the goods and/or merchandise and/or property from the overseas vessel at the final port of discharge is completed, the goods and/or merchandise and/or property are re-sold (but not being a sale within the terms of Sub-Clause 17.1.3) and are to be forwarded to a destination other than that covered by this insurance, the goods and/or merchandise and/or property are covered under this policy while deposited at such port of discharge until again in transit or until the expiry of the aforementioned 15 days, whichever shall first occur. If a sale is effected after the expiry of the aforementioned 15 days while this insurance is still in force, the protection afforded under this Sub-Clause 17.1.4 shall cease as from the time of the sale.

17.1.5    Held covered, at a premium to be arranged, in case of change of voyage or of any omission or error in the

14

description of the goods, merchandise, property, vessel or voyage.

**17.1.6**    This insurance shall in no case be deemed to extend to cover loss, damage or expense proximately caused by delay or inherent vice or the nature of the subject matter insured unless otherwise specifically provided for herein.

**17.2**    All other terms, conditions and warranties of the policy not in conflict with the foregoing remain unchanged, it being particularly understood and agreed that the F.C. & S. warranty specified in this policy remains in full force and effect, and that nothing in the foregoing shall be construed as extending this insurance to cover any risks of war or consequences of hostilities.

**18.**    **APPLICATION OF WAREHOUSE TO WAREHOUSE AND MARINE EXTENSION CLAUSE:**

**18.1**    Regardless of the terms of purchase, sale, bill(s) of lading or other documentation issued to the contrary, and provided The Insured is obligated to insure the primary transit, this insurance covers from warehouse to warehouse in accordance with the clauses contained in this policy.

**18.2**    In the event a claim arises under this Clause, The Insured agrees to use all reasonable means to first recover the full amount of such loss from the seller or buyer, as the case may be, in accordance with the terms of the purchase or sale prior to calling on this insurance for payment.

**19.**    **LOADING/UNLOADING:**

This insurance is extended to cover, subject to the applicable insuring terms, conditions and warranties set forth elsewhere in this policy, goods and/or merchandise and/or property intended for shipment (i) during the loading process prior to dispatch (including, into containers, trailers and rail cars) and continuing thereafter while they await the commencement of the transit and (ii) after they arrive at the final destination, and continuing thereafter, until they are unloaded (including, from containers, trailers and rail cars) and throughout the unloading process.

**20.**    **RECOOPERING/REPACKING:**

**20.1**    In the event the packaging of the goods and/or merchandise and/or property insured under this policy is damaged due to a risk insured against as a result of which it is necessary, in the sole judgment of The Insured, to recooper or provide

15

new packaging, This Insurer will pay the cost of recoopering and/or the cost of new packaging.

20.2　In respect of packaging which falls outside the above provisions, it is agreed that should the outer packaging be damaged from an insured risk which renders the insured goods and/or merchandise and/or property unfit for on-shipment or distribution, irrespective of the final destination shown herein, This Insurer will pay the expense of reasonable repackaging, provided such damage occurred during the currency of this insurance.

## 21.　BOTH TO BLAME:

21.1　In the event the bill(s) of lading, charter party or contract of carriage for the goods and/or merchandise and/or property insured under this policy contain the so-called "Both to Blame Collision Clause," This Insurer agrees (provided and to the extent that the loss, damage or claim so set off, recouped or recovered is the kind of loss, damage or expense recoverable under this policy) to indemnify The Insured for the amount which it is legally bound to pay to the shipowner, charterer, or carrier under such clause.

21.2　In the event such liability is asserted, The Insured agrees to notify This Insurer who shall have the right, at its own cost and expense, to defend The Insured against such claim and The Insured agrees to provide reasonable assistance in any defense.

## 22.　INTERRUPTION OF TRANSIT:

Notwithstanding anything contained elsewhere in this policy to the contrary, this insurance is extended to cover goods and/or merchandise and/or property insured under this policy whenever same are stopped in transit, anywhere in the world, short of final destination, subject to the applicable insuring terms, conditions and warranties set forth elsewhere in this policy.

## 23.　GOVERNMENTAL DAMAGE:

### 23.1　DELIBERATE DAMAGE - POLLUTION HAZARD:

This insurance is extended to cover, subject to the applicable insuring terms, conditions and warranties set forth elsewhere in this policy, loss of and damage to an insured shipment directly caused by a governmental authority acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that absent the governmental action, the shipment would

16

ASHLAND 0052

have sustained physical loss or damage as a result of the occurrence which prompted the governmental action and would have resulted, subject to the terms, conditions and warranties in this policy, in a claim recoverable under this policy.

**23.2   DELIBERATE DAMAGE - SERVICES:**

This insurance also covers, notwithstanding the F.C. & S. warranty specified in this policy, and subject to all other insuring terms, conditions and warranties set forth elsewhere in this policy, physical loss of and damage to the shipment arising out of the performance of inspection duties by customs service agents or other duly constituted governmental agencies.

**24.   MACHINERY:**

When the goods and/or merchandise and/or property insured under this policy include a machine or other article consisting, when complete for sale or use, of several parts, then in case of loss or damage covered by this insurance to any part of such machine or other article, This Insurer shall be liable only for the proportion of the insured value applicable to the part or parts lost or damaged, or at The Insured's option, for the cost and expense of replacing or repairing, assembling or duplicating the lost or damaged part or parts (including any and all expediting, labor and installation charges) and all other necessary charges so that the machine or article is restored to its condition at the time of shipment.

**25.   BRANDS AND TRADEMARKS:**

**25.1**   In case of damage to goods and/or merchandise and/or property insured under this policy bearing a brand or trademark, the sale of which in any way carries or implies a guarantee, the salvage value of such damaged goods and/or merchandise and/or property shall be determined after removal of all brands and trademarks.

**25.2**   With respect to packaging from which the brand or trademark cannot be removed, the contents shall be transferred into plain packaging, subject always to the consent of The Insured.

**25.3**   With respect to any goods and/or merchandise and/or property for which it is deemed by The Insured to be impractical to destroy all evidence of The Insured's connection therewith, This Insurer agrees to waive its right to salvage and The Insured is granted the option to destroy such damaged goods and/or merchandise and/or property.

**25.4**   The cost to remove brands and trademarks, as well as the cost to remove the contents from their original packaging and transfer them into plain packaging, shall be borne by This Insurer, but in no event shall This Insurer be liable for

17

ASHLAND 0053

more than the insured value of the damaged goods and/or merchandise and/or property.

26.  **LABELS:**

In case of damage affecting labels, capsules or wrappers or cartons, This Insurer, if liable therefore under the terms, conditions and warranties of this policy, shall be liable only for an amount sufficient to pay for the cost of new labels, capsules or wrappers or cartons and the cost of reconditioning the goods and/or merchandise and/or property, but in no event shall This Insurer be liable for more than the insured value of the damaged goods and/or merchandise and/or property.

27.  **PAIR AND SETS:**

It is understood and agreed that the loss of or damage to any one item of the goods and/or merchandise and/or property insured under this policy which consist of items in a pair or set, shall constitute a total loss of such pair or set.

28.  **CONTROL OF DAMAGED GOODS AND/OR MERCHANDISE AND/OR PROPERTY:**

Notwithstanding anything to the contrary (including the Brands and Trademarks Clause and the Labels Clause) contained elsewhere in this policy it is understood and agreed that in case of damage to goods and/or merchandise and/or property insured under this policy:

28.1  Insured is to retain full and absolute discretion and control over the disposition of all such goods and/or merchandise and/or property.  It is understood that The Insured shall be the sole judge as to whether disposal or sale of such goods and/or merchandise and/or property is detrimental to its interest.

28.2  Any goods and/or merchandise and/or property which The Insured deems unfit for sale or which it is unable to sell or dispose of under its agreement with any trade association or other entity, shall be treated as a constructive total loss, and The Insured shall dispose of the goods and/or merchandise and/or property to its best advantage with This Insurer being entitled to its share of the net proceeds resulting from such disposition, or the goods and/or merchandise and/or property shall be destroyed after notification to This Insurer and any expenses incurred in connection with such destruction shall be borne by This Insurer.  This Insurer shall be given the opportunity to have a representative in attendance during such destruction.

18

ASHLAND 0054

29. **SHORTAGE FROM CONTAINERS, ETC.:**

This Insurer is to pay for shortage of contents, meaning thereby, the difference between the number of items loaded or alleged to have been loaded in the container, trailer or railcar as per the shipper's or supplier's invoice or packing list and the number of items removed therefrom and received by The Insured or its agent at the time the container, trailer or rail car is unloaded howsoever, wheresoever and whensoever occurring.

30. **CONCEALED DAMAGE:**

30.1 With respect to goods and/or merchandise and/or property insured under this policy which are unloaded and received into the custody and control of the receiver at the warehouse, store or other location at destination ("date of receipt"), but are not immediately unpacked, then any damage to the goods and/or merchandise and/or property not discovered until they are unpacked shall, in the absence of proof to the contrary and provided they are unpacked within the 90th day after the date of receipt, be deemed to have occurred during the period of coverage under this policy.

30.2 If damage is discovered after the 90 day period, but the damage occurred during the period of coverage under this policy, the burden to show when the damage occurred shall revert to The Insured.

30.3 Nothing contained in this Clause shall be construed to limit or reduce the coverage provided in this policy.

31. **GENERAL AVERAGE:**

This insurance also covers general average, salvage and special charges and expenses which are payable for the goods and/or merchandise and/or property insured under this policy as provided in the contract of affreightment or in accordance with the laws and usages at the port of destination or in accordance with a foreign statement.

32. **INSUFFICIENCY OF PACKING CLAUSE:**

32.1 In the event of a claim being made for loss or damage which is alleged to be caused by insufficiency or unsuitability of packing or preparation of the insured goods and/or merchandise and/or property, This Insurer hereby agrees that it will not assert such alleged insufficiency or unsuitability as a defense against the claim in any case where the packing or preparation was carried out by a party other than The Insured making claim and the insufficiency or unsuitability arose without The Insured's privity or knowledge.

19

ASHLAND 0055

**32.2**  For the purpose of this Clause, "packing" shall be deemed to include stowage in a container, trailer or rail car.

## 33.  DEBRIS REMOVAL:

**33.1**  This insurance also covers expenses incurred by The Insured to remove and dispose of any remainder or residue of the insured goods and/or merchandise and/or property, including packing materials, which may be occasioned by a loss or damage caused by any of the risks insured against except that This Insurer shall not be liable under this Clause for more than 10% of the policy limit of liability set forth elsewhere in this policy.

**33.2**  Nothing in this Clause, however, shall be construed to extend cover to include any expenses incurred by The Insured to remove or dispose of the remainder or residue of the insured goods and/or merchandise and/or property if The Insured is responsible for such removal or disposal under any pollution statute.  Expenses incurred by The Insured to accomplish such removal or disposal are not covered under this policy.

## 34.  INCREASED VALUES AND/OR PROFITS:

**34.1**  This insurance shall also cover increased values and/or profits on shipments purchased by The Insured on C.I.F. terms or other similar terms under which the seller provides transit insurance for the account of The Insured.

**34.2**  In the event of a total or constructive total loss of the shipment, the increased values and/or profits shall be the difference between the amount of the insurance actually provided by the seller and the value of the shipment as calculated under the valuation provisions set forth elsewhere in this policy.

**34.3**  In the event of a partial loss of the shipment, This Insurer shall not be liable under Sub-Clause 34.1 for a greater percentage of the loss, damage or expense than would be payable on the shipment if it had originally been insured by This Insurer.

**34.4**  The coverage provided in this Clause shall be free of claims for general average, salvage and special charges and expenses except on the portion of the contributory value of the shipment in excess of the amount actually insured and only if uncollectible under the insurance provided by the seller.

**34.5**  The coverage provided in this Clause shall be without benefit of salvage unless the terms of the insurance provided by the seller permit participation.

20

ASHLAND 0056

35.  **FRAUDULENT BILLS OF LADING:**

This policy also covers physical loss incurred by The Insured through the acceptance by The Insured, its agents or the shipper of fraudulent bills of lading, shipping receipts, messenger receipts, warehouse receipts or other shipping documents. Also to cover loss or damage through the utilization of legitimate shipping documents without the authorization or consent of the Insured, its agents or the shipper.

36.  **DEMURRAGE CHARGES:**

If The Insured is directed by This Insurer to retain a container, trailer or rail car and if The Insured is assessed a late penalty and/or demurrage charge for the holding of the container, trailer or rail car past the return date, This Insurer will pay late penalties and demurrage charges.  The amount This Insurer will pay shall be the charges assessed until such time as This Insurer and The Insured agree that the container, trailer or rail car may be released.

37.  **LANDING, WAREHOUSING:**

37.1  In the event of frustration, interruption, or termination of the insured voyage, or similar events beyond the control of The Insured and in addition to the limit(s) of liability set forth elsewhere in this policy, This Insurer agrees to pay all landing, warehousing, transshipping, forwarding and other expenses incurred by The Insured to forward the insured goods and/or merchandise and/or property to the original or substituted final destination should same be incurred by reason of a risk insured against, including as a result of the insolvency or financial default of the owner, charterer, manager or operator of the vessel or other conveyance.

37.2  This Insurer will also pay any partial loss or damage to the shipment arising from any loading, transshipment, forwarding or discharge at a port of distress.

37.3  Also to pay the full insured value of any package, piece or unit in the shipment which is totally lost in loading, transshipment, forwarding or discharge.

38.  **EXPEDITING COST:**

Where there is loss, damage, general average, salvage and/or special charges which are, or will be, the subject of a claim under this policy, and The Insured considers it necessary to forward replacements and/or replacement parts by means other than the means by which the original shipment was dispatched, This Insurer will pay the expediting costs so involved and any overtime repair costs and/or other additional

21

expenses including duties, taxes and destination charges, in addition to the underlying claim.

### 39.   REFUSED OR RETURNED SHIPMENT:

This insurance covers, subject to the applicable insuring conditions set forth elsewhere in this policy, all shipments which may be refused and are to be returned by the consignee or others while awaiting shipment or reshipment and until received by The Insured or otherwise disposed of.

### 40.   F.O.B., F.A.S., C. & F. SHIPMENTS:

**40.1**   This insurance is extended to cover and will attach to goods and/or merchandise and/or property sold by The Insured on F.O.B., F.A.S., and C. & F. terms, or on similar terms, whereby The Insured is not required to provide transit insurance, from the time the goods and/or merchandise and/or property, or any portion thereof, depart from the warehouse, store, factory, or other location at the initial point of shipment (including while loaded in railroad cars while in or on private sidings prior to the issuance of the railroad bill(s) of lading) and continuing thereafter until all of the goods and/or merchandise and/or property are delivered alongside the overseas vessel or other conveyance or loaded on board the overseas vessel or conveyance as per the terms of sale.

**40.2**   It is agreed that the coverage provided under the terms of this Clause shall be subject to the applicable terms, conditions and warranties set forth elsewhere in this policy.

### 41.   DIFFERENCE IN CONDITIONS:

**41.1**   With respect to goods and/or merchandise and/or property purchased by The Insured on C.I.F. or similar terms, where insurance is arranged by the seller or others, this insurance is extended to cover the difference in the terms, conditions and warranties between the terms, conditions and warranties of such other insurance and the terms, conditions and warranties of this insurance, if the goods and/or merchandise and/or property would otherwise have been insured hereunder.

**41.2**   All goods and/or merchandise and/or property insured under this Clause shall be valued as per the valuation provisions set forth elsewhere in this policy.

22

ASHLAND 0058

**41.3**   It is noted and agreed that where The Insured is obliged by legislation or otherwise to arrange insurance locally, it shall continue to have the full benefit and protection of this insurance for any difference between this insurance and the terms, conditions and warranties in the insurance arranged elsewhere.

**41.4**   It is agreed that nothing in this Clause shall be construed to extend the obligation of This Insurer to pay more than the limit(s) of liability set forth elsewhere in this policy.

**42.   CONTINGENT INTEREST/UNPAID VENDORS:**

**42.1**   This insurance is extended to cover the interest of The Insured, as a vendor in a credit transaction, on all shipments made by The Insured on terms under which The Insured is not obliged to furnish transit insurance.

**42.2**   This Insurer will guarantee to The Insured the prompt collection of losses, damages and expenses otherwise coming within the terms, conditions and warranties of this insurance in connection with shipments for which The Insured has not been paid. This Insurer will advance to The Insured the amount of the loss, damage or expense, as a loan without interest.  Such advance shall be repayable upon, but subject to and only to the extent of (i) the receipt of the purchase price by The Insured, or (ii) any recovery received by The Insured from insurance effected by the buyer or otherwise.

**42.3**   It is agreed that the coverage provided under the terms of this Clause shall be subject to the applicable terms, conditions and warranties set forth elsewhere in this policy.

**42.4**   All goods and/or merchandise and/or property insured under this Clause shall be valued as per the valuation provisions set forth elsewhere in this policy.

**43.   GUARANTEE OF COLLECTIBILITY:**

**43.1**   With respect to all goods and/or merchandise and/or property purchased by The Insured on C.I.F. or similar terms, where the seller is required to furnish insurance, This Insurer guarantees collection of any claim recoverable under the seller's transit insurance, but only to the extent the claim would be recoverable under the terms, conditions and warranties set forth in this policy if the goods and/or merchandise and/or property had been insured hereunder.

**43.2**   In no event shall this insurance inure to the benefit of the seller or his insurer, and The Insured agrees to make, and will make, all reasonable efforts to collect the full amount of any loss, damage or expense from the seller and his insurer, but in the event The Insured is unsuccessful in making a recovery, This Insurer will

ASHLAND 0059

advance to The Insured the amount of the uncollected loss, damage or expense as a loan without interest.

44.   **SUE AND LABOR:**

44.1   In the case of any imminent or actual loss or misfortune, it shall be lawful and necessary to and for The Insured, its factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the goods and/or merchandise and/or property and/or interest insured hereunder, or any part thereof, without prejudice to this insurance.

44.2   The acts of The Insured or This Insurer in recovering, saving and preserving the insured goods and/or merchandise and/or property, shall not be considered a waiver or an acceptance of an abandonment.

44.3   This Insurer will pay all such sue and labor expenses subject to the limit of liability set forth elsewhere in this policy.

45.   **DELAY:**

This insurance is warranted free from, and shall not cover, loss of market or loss, damage or expense arising from delay, regardless of whether such delay is caused by a risk insured against or otherwise, unless such risks are expressly assumed elsewhere in this policy.

46.   **CARRIER OR BAILEE:**

Warranted that this insurance shall not inure, directly or indirectly, to the benefit of any carrier or bailee.

47.   **PARAMOUNT WARRANTIES:**

The following Warranties shall be paramount and shall not be amended or superseded by any other provision included herein or stamped or endorsed hereon, unless such other provision refers specifically to the risks excluded by these warranties and expressly assumes the said risks:

24

ASHLAND 0060

47.1   **F.C. & S. WARRANTY (APRIL 3, 1980):**

**NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY THIS INSURANCE IS WARRANTED FREE FROM:**

(i)   capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise;

(ii)   all loss, damage or expense, whether in time of peace or war, caused by (i) any weapon of war employing atomic or nuclear fission and/or fusion or other reaction or radioactive force or matter or (ii) any mine or torpedo;

(iii)   all consequences of hostilities or warlike operations (whether there be a declaration of war or not), but this warranty shall not exclude collision or contact with aircraft, or with rockets or similar missiles (other than weapons of war) or with any fixed or floating object (other than a mine or torpedo), stranding, heavy weather, fire or explosion unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein, is performing) by a hostile act by or against a belligerent power; and for the purpose of this warranty "power" includes any authority maintaining naval, military or air forces in association with a power;

(iv)   the consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom; or from the consequences of the   imposition of martial law, military or usurped power; or piracy.

47.2   **S.R. & C.C. WARRANTY (APRIL 3, 1980):**

**NOTWITHSTANDING ANYTHING HEREIN CONTAINED TO THE CONTRARY, THIS INSURANCE IS WARRANTED FREE FROM LOSS, DAMAGE OR EXPENSE CAUSED BY OR RESULTING FROM:**

(v)   strikes, lockouts, labor disturbances, riots, civil commotions, or the acts of any person or persons taking part in any such occurrences or disorders;

(vi)   vandalism, sabotage or malicious act, which shall be deemed also to encompass the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional.

ASHLAND 0061

**47.3    CLAUSE PARAMOUNT - NUCLEAR EXCLUSION (AIMU APRIL 1, 1991):**

This clause shall be paramount and shall not be modified or superseded by any other provision included herein or stamped or endorsed hereon:

Notwithstanding anything to the contrary herein, it is hereby understood and agreed that this policy shall not apply to any loss, damage or expense due to or arising out of, whether directly or indirectly, nuclear reaction, radiation or radioactive contamination, regardless of how it was caused. However, subject to all provisions of this policy, if this Policy insures against fire, then direct physical damage to the property insured located within the United States, or any territory of the United States or Puerto Rico, by fire directly caused by the above excluded perils, is insured, provided that the nuclear reaction, radiation, or radioactive contamination was not caused, whether directly or indirectly, by any of the perils excluded by the F.C. & S. Warranty of this Policy.

Nothing in this clause shall be construed to cover any loss, damage, liability or expense caused by nuclear reaction, radiation or radioactive contamination arising directly or indirectly from the fire mentioned above.

**48.    NEGLIGENCE:**

**48.1**    The Insured is not to be prejudiced by the presence of the negligence clause and/or latent defect clause in the bill(s) of lading, charter party, contract of carriage or other contract.

**48.2**    The seaworthiness of the vessel, craft as between The Insured and This Insurer, is hereby admitted, and the wrongful act or misconduct of the shipowner, charterer or carrier, or their servants causing loss, damage or expense shall not defeat recovery under this policy, if the loss, damage or expense in the absence of such wrongful act or misconduct would have been a loss, damage or expense recoverable under this policy. With leave to sail with or without pilots, and to tow and assist vessels or craft in all situations.

**49.    LETTER OF CREDIT:**

**49.1**    Permission is also granted to The Insured to attach the London Institute Cargo Clauses and War, Strikes, Riots and Civil Commotions Clauses or other London or American Institute Clauses to special policies and/or certificates of insurance where such clauses are required by the terms of sale, letter of credit or other banking requirements. When such an attachment is made, the attached clauses are deemed to be added to this policy and the terms and conditions in such clauses shall override any inconsistent term, condition or warranty in this policy and shall be controlling to the extent of any inconsistency.

26

ASHLAND 0062

**49.2**  If the terms and conditions of such attached clauses provide broader coverage than those in this policy, This Insurer is entitled to additional premium, if any, to be agreed.

**50.**  **WAIVER AND/OR RELEASE:**

Privilege is given to The Insured to enter into and to accept contracts and agreements and any and all other documents (whether for carriage or otherwise) from any third party, containing usual waivers and/or releases of liabilities, provided such acceptance is made prior to any known or reported loss or accident.

**51.**  **PROTECTION OF SUIT TIME:**

**51.1**  This Insurer and The Insured agree that, after This Insurer has been notified of a claim for loss, damage or expense recoverable under this policy, This Insurer shall be responsible for protecting suit time against all persons who may be liable for such loss, damage or expense. The Insured agrees to cooperate with This Insurer to protect suit time.

**51.2**  If, solely because of the failure of The Insured to (i) give This Insurer timely notice of the claim or (ii) cooperate with This Insurer to protect suit time, suit time is not protected, The Insured's claim will not be vitiated, but the claim may be reduced by the amount of the expected reasonable recovery from the liable party(ies).

**52.**  **NOTICE OF LOSS:**

The Insured shall report to (i) Marsh Risk & Insurance Services for transmission to This Insurer, (ii) This Insurer, or (iii) the agent of This Insurer if there be one at or near the place where the loss or damage occurs or expenses are incurred, or if there be none in the vicinity, to (iv) the local correspondent of the American Institute of Marine Underwriters or (v) the local Lloyd's Agent, loss, damage and expenses which may become a claim under this insurance as soon as may be practicable after it becomes known to The Insured.

**53.**  **PARTIAL LOSS:**

**53.1**  In case of a covered partial loss to the goods and/or merchandise and/or property insured under this policy caused by risks insured against, the loss shall be determined by a separation of the damaged portion of the insured goods and/or merchandise and/or property from the sound and shall be the percentage of damage on the damaged portion as agreed by The Insured and This Insurer.

ASHLAND 0063

53.2   If no percentage is mutually agreed upon, then by public sale of the damaged portion for the account of The Insured and by comparison of the amount so realized with the market value of the damaged portion if it were in sound condition on the day of sale.

53.3   At the option of The Insured, claims for insured goods and/or merchandise and/or property arriving at destination in a damaged condition may be settled on a "salvage adjustment" basis, with This Insurer paying the insured value of the damaged portion after taking credit for any salvage proceeds.

## 54.   CONSTRUCTIVE TOTAL LOSS:

No recovery for a constructive total loss shall be had under this policy unless (i) the insured goods and/or merchandise and/or property are reasonably abandoned on account of their actual total loss appearing to be unavoidable, or (ii) because they cannot be preserved from actual total loss without incurring an expenditure which, if incurred, The Insured reasonably believes would exceed the expected value of the goods and/or merchandise and/or property.

## 55.   OTHER INSURANCE:

55.1   In case the goods and/or merchandise and/or property, insured under this policy are covered by other insurance (except as hereinafter provided), the covered loss, damage or expense shall be collected from the several policies in the order of the date of their attachment.

55.2   Insurances attaching on the same date are deemed simultaneous and are to contribute pro rata; provided, however, that where any fire insurance, or any insurance (including fire) taken out by any carrier or bailee (other than The Insured) is available to the beneficiary of this policy, or would be so available if this insurance did not exist, then this insurance shall be void to the extent that such other insurance is or would have been available.

55.3   It is agreed, nevertheless, that where This Insurer is thus relieved of a liability because of the existence of other insurance, This Insurer shall receive and retain the premium payable under this policy and, in consideration thereof, shall guarantee the solvency of the companies and/or insurers who issued such other insurance and the prompt collection of the loss, damage or expense thereunder, but only to the same extent that This Insurer shall have been relieved of liability by reason of the terms of this Clause and not exceeding, in any case, the amount which would have been collectible under this policy if such other insurance did not exist.

28

ASHLAND 0064

**56.    PAYMENT OF LOSS:**

All claims are to be paid to The Insured within thirty (30) days after satisfactory proof of loss has been filed with This Insurer.

**57.    PAYMENT ON ACCOUNT:**

When the claim documents submitted demonstrate, and This Insurer and The Insured agree, that only the quantum of the claim is yet to be agreed, a payment on account will be made equal to the lower of the amount (i) claimed by The Insured or (ii) agreed to by This Insurer or the surveyor approved by This Insurer, within 10 business days after such agreement.

**58.    SUBROGATION:**

**58.1**    It is agreed that upon payment of any loss, damage or expense under this policy, This Insurer shall become subrogated, to the extent of such payment, to the rights of The Insured against any carrier, bailee, seller, buyer, other insurer or other third party who may be liable for or who may have an obligation to pay, the loss, damage or expense.

**58.2**    This Insurer, however, may not assert a subrogated claim against a parent, subsidiary or an affiliate of The Insured without The Insured's prior written permission.

**58.3**    This Insurer may not bring suit solely in the Insured's name without prior written permission from The Insured, but if granted, always at This Insurer's expense.

**58.4**    The Insured agrees to render all reasonable assistance in the prosecution of subrogated claims by This Insurer.

**58.5**    Any recovery made by This Insurer in connection with a subrogated claim shall be shared with The Insured on a proportionate basis. The Insured's share shall be calculated by multiplying the gross recovery (after deducting only the actual expense of This Insurer to prosecute the claim) by the percentage obtained after dividing the sum of any deductible plus any uninsured loss, damage and expense by the sum of the deductible plus any uninsured loss, damage and expense plus the amount of loss, damage and expense paid by This Insurer. This Insurer retains the balance.

**58.6**    Notwithstanding anything contained herein to the contrary, This Insurer agrees to waive any rights of subrogation against any party whom The Insured has released from liability or any party The Insured has agreed not to sue.

ASHLAND 0065

**59.    ADDITIONAL COVERAGE/SPECIAL CONDITIONS:**

### 59.1    EXHIBITIONS, DEMONSTRATIONS, AND CONSIGNMENT

This policy is extended to cover, subject to its terms and conditions, on property of the Assured or property of others while in the care, custody, or control of the Assured and for which the Assured is legally liable, while on exhibition and/or demonstration and/or consignment and while in due course of transit to and from. Also to cover property during incidental storage prior to, while at and after Exhibition.

This policy does not insure against loss or damage caused by or resulting from infidelity and/or dishonesty of the Assured or their employees or any person or persons to whom the goods may be entrusted (bailees excepted). This Company shall not be liable under this Clause for more than **"As Per Declaration Page".** as respects any one exhibition, demonstration or consignment or in any one place at any one time.

### 59.2    SALESMEN'S SAMPLES

This policy is extended, subject to its terms and conditions, to cover samples of goods and merchandise, including any associated accessories and equipment that are usual to the business of The Insured, and the property of The Insured or similar property of others for which The Insured may be liable, while in the care, custody or control of The Insured's Sales Representatives and including, but not limited to, while in transit, in storage, or at any place or location.

This Insurer shall not be liable under this Clause for more than **"As Per Declaration Page"** as respects any one Sales Representative or in any one place at any one time.

**60.    NON-ADMITTED INSURANCE - TAX CLAUSE**

In the event of a loss payable under this policy to a foreign subsidiary of the insured, where it is not legally permissible to pay the claim in the country of loss, it is agreed that these Assurers will pay the insured the income tax the insured must pay on the recovered claim.

**61.    SUBSTITUTION:**

Wherever the words "This Insurer" appear in the policy they are deemed to include the plural "These Insurers."

30

ASHLAND 0066

62. **PRECEDENCE OF CONDITIONS:**

The terms, conditions and warranties contained in this manuscript policy shall override anything that is at variance, or inconsistent with or contradictory to the printed policy to which this manuscript policy may be attached.

63. **CAPTIONS:**

The captions of the clauses set forth in this policy are for reference purposes only and shall not be deemed to form part of this policy.

64. **SUIT AGAINST INSURER:**

This Insurer agrees that any action or proceeding against This Insurer for the recovery of any claim under or by virtue of this insurance shall not be barred if commenced within the time prescribed therefore in the statutes of the state in which this policy is issued or other State or County having jurisdiction.

65. **PERILS**

Touching the adventures and perils which the said Assurers are contented to bear, and take upon themselves, they are of the seas and inland waters, men-of-war, fires, enemies, pirates, rovers, assailing thieves, jettisons, letters of mart and counter-mart, reprisals, takings at sea, arrests, restraints and detainments of all kings, princes or people of what nation condition or quality so ever, barratry of the master and mariners, and all other like perils, losses and misfortunes, that have or shall come to the hurt, detriment or damage to the said goods and merchandise, or any part thereof.

66. **INSURABLE INTEREST**

With respect to the coverages provided in this policy, whether they be contingent, extended or otherwise, the insurable interest of The Insured is admitted at all times.

67. **WAIVER OF SURVEY**

It is agreed that survey reports are not required on claims originally estimated at $5,000.

ASHLAND 0067

**68.**  **REQUIRED BY LAW:**

Any provisions required by law to be stated in this policy by This Insurer are deemed to be stated herein.

**69.**  **POLICY NUMBER:**

Attached to and forming part of Policy Number **"As Per Declaration Page"** of This Insurer **"As Per Declaration Page"**.

**70.**  **SIGNATURE OF THIS INSURER:**

In WITNESS WHEREOF, This Insurer has executed, issued and delivered this policy at Los Angeles, CA **" As Per Declaration Page."**

32

ASHLAND 0068

**American Institute of Marine Underwriters**
Endorsement for Open Policies (Cargo)
Strikes, Riots & Civil Commotions (Form 12A)
(January 1, 2008)

**S.R. & C.C. Endorsement (form No. 12A)**

THIS INSURANCE ALSO COVERS:

(1)     Physical loss of or damage to property insured directly caused by strikers, locked-out workmen, or persons taking part in labor disturbances or riots or civil commotions;

(2)     Physical loss of or damage to the property insured directly caused by vandalism, sabotage or malicious acts; and,

(3)     Physical loss of or damage to the property insured directly caused by the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional; PROVIDED that any claim to be recoverable under this subsection (3) be not excluded by the Free of Capture & Seizure Warranty, Extended Radioactive Contamination Exclusion Clause (Extended RACE Clause) or Chemical, Biological, Bio-Chemical and Electromagnetic Exclusion Clause (CBE Clause) in the Policy to which this endorsement is attached.  Notwithstanding the foregoing, coverage under this subsection (3) is conditional upon the property insured being in the ordinary course of transit and, in any event, **shall terminate:**

(a)     As per the Warehouse to Warehouse Clause, Marine Extension Clause, 60 Day South American Clause and any other clauses relating to duration of transit contained in or endorsed onto the Policy; or,

(b)     on delivery to the consignee's or other final warehouse or place of storage at the destination named herein; or,

(c)     on delivery to any warehouse or place of storage whether prior to or at the destination named herein, which the Assured elects to use either for storage other than in the ordinary course of transit or for allocation or distribution; or,

(d)     in respect of marine transits, on the expiry of 60 days after completion of discharge overside of the property insured from the vessel at the port of discharge; or,

(e)     in respect of air transits, on the expiry of 30 days after unloading the property insured from the aircraft at the place of discharge;

**whichever shall first occur.**

Notwithstanding the foregoing, nothing in this clause excludes coverage for insured losses, which are otherwise covered by this insurance, caused by certified acts of terrorism, as defined in the Terrorism Risk Insurance Act (P.L.#107-297), or any subsequent amendments or endorsements to the Act.

33

ASHLAND 0069

While the property insured is at risk under the terms and conditions of this insurance within the United States of America, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and Canada, this insurance is extended to cover physical loss of or damage to the property insured directly caused by acts committed by an agent of any government, party or faction engaged in war, hostilities or other warlike operations, provided such agent is acting secretly and no in connection with any operation of military or naval armed forces in the country where the described property is situated.

Nothing in this endorsement shall be construed to cover any loss, damage or expense directly or indirectly arising from, contributed to or caused by any of the following, whether due to a peril insured against or otherwise:

(a)    change in temperature or humidity;

(b)    the absence, shortage, or withholding of power, fuel, or labor of any description whatsoever during any strike, lockout, labor disturbance, riot or civil commotion;

(c)    loss of market or loss, damage or deterioration arising from delay;

(d)    hostilities, warlike operations civil war, revolution rebellion or insurrection, or civil strife arising therefrom, except to the limited extent that the acts if certain agents acting secretly have been expressly covered above; or,

(e)    nuclear reaction, radiation or radioactive contamination, as per Extended RACE Clause;

(f)    chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material, as per CBE Clause.

The Assured agrees to report all shipments attaching under this cover and to pay premiums therefore at the rates established by the Assurer from time to time.

This endorsement may be canceled by either party upon forty-eight hours written, telegraphic, telefaxed, or electronic notice to the other party, but such cancellation shall not affect any risks which have already attached hereunder.

All Other Terms and Conditions Remain Unchanged.

34

ASHLAND 0070

**AIMU EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE WITH U.S.A. ENDORSEMENT (March 1, 2003)**

This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.

1.   In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from

    1.1   ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

    1.2   the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

    1.3   any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

    1.4   the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter.  The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

**RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE (U.S.A. ENDORSEMENT)**

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (March 1, 2003) provided that

if fire is an insured peril and

where the subject matter insured or, in the case of a reinsurance, the subject matter insured by the original insurance, is within the U.S.A., its islands, onshore territories or possessions and

a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2, and 1.4 of the Extended Radioactive Contamination Exclusion Clause March 1, 2003 any loss or damage arising directly from that fire shall, subject to the provisions of this insurance (reinsurance), be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

35

ASHLAND 0071

**AIMU**

**CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, ELECTROMAGNETIC WEAPONS AND CYBER ATTACK EXCLUSION CLAUSE (U.S.A.) (March 1, 2003)**

**With respect to the peril of Terrorism as defined in the Terrorism Exclusion Clause, this clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

1.     In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from

1.1    Any chemical, biological, bio-chemical or electromagnetic weapon or device.

1.2    the use or operation, as a means for inflicting harm, of any computer, computer system, computer software program, computer virus or process or any other similar electronic system.

36

ASHLAND 0072

## U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") such coverage shall be null and void.

Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

ASHLAND 0073

**ENDORSEMENT NO. 1**

**EXTRA EXPENSE EXTENSION**

This insurance is extended, following direct physical loss or damage to the subject matter insured hereunder, to cover any additional costs incurred by the Assured for the procurement of replacement product, of a like quality, to satisfy existing or future obligations to customers. Subject to a limit of USD500,000 any one occurrence and in the annual aggregate.

Expenses recoverable under the above clause shall be in addition to any sue and labor or other expenses which may be recoverable elsewhere under this policy.

**All other terms and conditions remaining unchanged.**

*Per* National Union Fire Insurance Company of Pittsburgh, PA

38

ASHLAND 0074

**ENDORSEMENT NO. 2**

**CONTINGENT / DIC / DIL COVERAGE**

Notwithstanding anything contained herein to the contrary, it is hereby noted and agreed to provide contingent, difference in conditions and difference in limits coverage hereunder to the domestic underlying policy(ies) placed in respect of risks in the countries of Germany and Australia.

This is on the basis that any claim(s) made under the appropriate domestic primary policy shall be considered as first applying to those perils and/or property and/or coverage(s) not insured against by this policy.  Upon exhaustion of the appropriate domestic primary policy limits, this policy shall drop down and be liable for the loss in excess of the amount attributable to the appropriate domestic primary policy as respects those perils and/or coverage(s) and/or property insured hereunder, subject to the policy limits mentioned elsewhere herein.

**All other terms and conditions remaining unchanged.**

*Per*  National Union Fire Insurance Company of Pittsburgh, PA

39

ASHLAND 0075

## ENDORSEMENT NO. 3

### PROFIT SHARING AGREEMENT

It is hereby understood and agreed that his policy is subject to a Profit Sharing Plan applicable to the Marine Premiums and losses developed from shipments made and values at risk (excluding risks of War, Strikes, Riots and Civil Commotions) during the period commencing February 1, 2013 and ending January 1, 2014 and during each 12 consecutive months thereafter.

The Insured shall participate in profits, if any, on the following basis:

a)  Net marine premiums less returns billed and collected by Insurer;

b)  Less 50% of the net marine premiums as per a);

c)  Less all claims (paid and outstanding), related expenses and survey fees incurred, (such claims, expenses and fees to be reduced by recoveries received, if any);

d)  The balance, if any, remaining after c) is deemed to be profit for the purposes of this plan, and, the Insured will be entitled to receive 50% of this profit;

e)  At the end of six (6) months following the end of each profit sharing period, a provisional computation shall be made and Insured shall be paid on half (1/2) of the estimated profit share. Twelve (12) months after the end of each profit sharing period, a final adjustment shall be made;

f)  For purposes of this agreement, the figures, recorded in the Insurer's books shall be accepted by both parties;

g)  Deficits, (i.e. claims, etc. as per c) over 50% of the premiums as per a)), if any, shall be carried forward to the next two profit sharing periods, as applicable;

h)  Cancellation of this policy shall automatically nullify any profit sharing due to the Insured for the period during which such cancellation becomes effective.

**All other terms and conditions remaining unchanged.**

*Per* National Union Fire Insurance Company of Pittsburgh, PA

40

ASHLAND 0076

**ENDORSEMENT NO. 4**

**BULK CHEMICAL CLAUSES (SP-13C)**

Shipments consisting of bulk chemicals are insured:

Per Bulk Oil Clauses (SP-13C) extended to include shortage and/or leakage and/or loss in weight (or volume) and/or contamination howsoever arising (As Attached Below).

In the event of failure to follow warranties required for the coverage described below, this insurance shall cover all risks of direct physical loss of or damage to the subject matter insured from any external cause but specifically excluding unexplained shortage and/or unexplained loss in weight (or volume). Not withstanding anything contained herein to the contrary, it is understood and agreed that claims for shortage and/or leakage and/or loss in weight (or volume) shall not be recoverable hereunder unless proved by the Assured to be due to a fortuitous cause, accident or event.

## BULK CLAUSES (SP-13C)

1.   The Assured are not to be prejudiced by the presence of the negligence clause and/or latent defect clause in the bills of lading and/or charter party. The seaworthiness of the vessel and/or craft as between the Assured and Assurers is hereby admitted, and the Assurers agree that in the event unseaworthiness or a wrongful act or misconduct of shipowner, charterer, their agents or servants, shall directly or indirectly, cause loss or damage to the cargo insured by sinking, stranding, fire, explosion, contact with seawater, or by any other cause of the nature of any of the risks assumed in the policy, the Assurers will (subject to the terms of average and other conditions of the policy) pay to an innocent Assured the resulting loss. With leave to sail with or without pilots, and to tow and assist vessels or craft in all situations and to be towed.

2.   Provided prompt notice be given the Assurers when such facts are known to the Assured and additional premium be paid if required, it is understood and agreed that in case of short shipment in whole or in part by the vessel reported for insurance hereunder, or if the goods be transhipped by another vessel or vessels, or be carried beyond or discharged short of destination, or in the event of deviation, or change of voyage, or any interruption or other variation of the voyage or risk beyond the control of the Assured, this insurance shall nevertheless cover the goods until arrival at the final destination named in the policy or certificate of insurance or until the subject matter insured is no longer at the risk of the Assured, whichever may first occur. No additional risks (whether of delay or of any other description) are insured under this clause, which is intended merely to continue the insurance in force against the same risks named elsewhere in this policy or certificate and if the risks of War, Strikes, Riots or Civil Commotions, or any of these risks, are insured against, the insurance against such risks shall not be extended by this clause to cover contrary to any express provision of such insurance.

41

ASHLAND 0077

3. Including all risks of transshipment if required and of craft to and from the vessel, each lighter, craft or conveyance to be considered as if separately insured; also to cover any special or supplementary lighterage at additional premium if required. The Assured is not to be prejudiced by any agreement exempting lightermen from liability.

4. General Average, Salvage and Special Charges, as per foreign custom, payable according to foreign statement, and/or per York-Antwerp Rules and/or in accordance with the contract of affreightment, if and as required; or, failing any provision in or there be no contract of affreightment, payable in accordance with the Laws and Usages of the Port of New York; and it is agreed that in the event of salvage, towage or other assistance being rendered to the vessel and/or interest hereby insured by any vessel belonging in part or in whole to the same owner or under the same management, the value of such services (without regard to the common ownership or management) shall be ascertained by arbitration and the amount so awarded, insofar as applicable to the interest hereby insured, shall constitute a charge under this policy.

5. In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever whether due to negligence or not, for which or for the consequences of which the Shipowner is not responsible by statute or contract or otherwise, these Assurers shall nevertheless pay Salvage and/or Special Charges incurred in respect of the interests hereby insured and shall contribute with the Shipowner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred.

6. It is agreed that no right of subrogation except through General Average shall lie against any vessel or craft, or in respect to any pipe lines, on which cargo hereby insured is being carried or in respect which freight insured hereunder is at risk, belonging in part or in whole to a subsidiary and/or affiliated company.

7. Against all risks whatsoever (excepting as hereinafter provided) excluding the risks excepted by the F.C.&S. and S.R.&C.C. warranties incorporated herein, from time of leaving tanks at port of shipment and whilst in transit and/or awaiting transit and until safely delivered in tanks at destination, but notwithstanding anything herein to the contrary, the Assurers are not liable for shortage and/or leakage and/or contamination (except as elsewhere in this policy provided) unless caused by or arising out of the vessel or craft being stranded, sunk, burnt, in collision or in contact with any substance or thing (ice included) other than water, fire, explosion (howsoever and wheresoever occurring) or there be a forced discharge of cargo; provided, however, that these Assurers are liable for contamination resulting from stress of weather.

It is agreed that notwithstanding anything herein to the contrary, this insurance is to pay the insured value of any materials lost from connecting pipe lines, flexible or otherwise, in loading, transshipment or discharge.

42

ASHLAND 0078

Claims are to be paid irrespective of percentage, but subject to deduction for normal shortage (as Per Declaration Page).

8.   This insurance is also especially to cover any loss of and/or damage to the interest insured hereunder, including shortage and/or leakage and/or contamination, through the bursting of boilers, breakage of shafts or through any latent defect in the machinery, hull or appurtenances, or from faults or errors in the navigation and/or management of the vessel by the Master, Mariners, Mates, Engineers or Pilots; provided, however, that this clause shall not be construed as covering loss arising out of delay, deterioration or loss of market, unless otherwise provided elsewhere in this policy.

9.    These Assurers also agree that any action or proceeding against them for the recovery of any claim under or by virtue of this insurance shall not be barred if commenced within the time prescribed therefore in the Statutes of the State of New York.

10.   The warranty that vessel be loaded under inspection of surveyors appointed by the underwriters is hereby waived.

11.   In the event that this Policy is extended to cover property prior to the attachment or subsequent to the expiration of the cover provided by the attached Marine Extension Clauses, such extension shall always be subject to the following exclusion unless specifically otherwise stated in writing signed by this company in the extension endorsement or otherwise:

This Company shall not be liable for any claim for loss, damage or expense arising directly or indirectly from any nuclear incident, reaction, radiation or any radio-active contamination, all whether controlled, or uncontrolled, occurring while said property is within the United States or any territory of the United States, the Canal Zone or Puerto Rico, or arising from a source therein, and whether the loss, damage or expense be proximately or remotely caused thereby, or be in whole or in part caused by, contributed to, or aggravated by the peril(s) insured against in this Policy; however, subject to the foregoing and all provisions of this Policy, if this Policy insures against the peril of fire, then direct loss by fire resulting from nuclear incident, nuclear reaction, or nuclear radiation or radioactive contamination is insured against by this Policy.

12.   Notwithstanding anything herein contained to the contrary, this insurance is warranted free from capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise; also warranted free whether in time of peace or war, from all loss, damage or expense caused by any weapon of war employing atomic or nuclear fission and/or fusion or other reaction or radioactive force or matter or by any mine or torpedo, also warranted free from all consequences of hostilities or warlike operations (whether there be a declaration of war or not), but this warranty shall not exclude collision or contact with aircraft, rockets or similar missiles or with any fixed or floating object (other than a mine or torpedo), stranding,  heavy

43

ASHLAND 0079

weather, fire or explosion unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein, is performing) by a hostile act by or against a belligerent power; and for the purposes of this warranty 'power' includes any authority maintaining naval, military or air forces in association with a power.

Further warranted free from the consequences of civil war, revolution, rebellion, insurrection, or civil strike arising therefrom, or piracy.

13. Warranted free of loss or damage caused by or resulting from strikes, lockouts, labor disturbances, riots, civil commotions or the acts of any person or persons taking part in any such occurrence or disorder.

14. If this policy is issued for a period of time, it is agreed that should the vessel at the expiration hereof be at sea, or in distress, or at a port of refuge or of call, the interest hereby insured shall, provided previous notice be given to the insurers, be held covered at a pro rata premium until arrival at port of destination.

15. Where goods are shipped under a bill of lading containing the so-called "Both to Blame Collision" Clause these Assurers agree, as to all losses covered by this insurance, to indemnify the Assured for any amount (up to the amount insured) which the Assured may be legally bound to pay to the shipowners under such clause. In the event that such liability is asserted the Assured agree to notify the Assures who shall have the right at their own cost and expense, to defend the Assured against such claim.

## SHORTAGE, LEAKAGE AND CONTAMINATION CLAUSES

THIS INSURANCE ALSO COVERS:

Loss due to shortage and/or leakage and/or contamination howsoever arising, provided, however, that such claims are payable only in excess of .5% of the insured value of the whole shipment, each vessel.

But excluding, nevertheless, the risks of war, strikes, riots, seizure, detention and other risks excluded by the F.C. & S.. (Free of Capture & Seizure) Warranty and the S.R. & C.C. (Strikes, Riots and Civil Commotions) Warranty in this policy, excepting to the extent that such risks are specifically covered by endorsement.

ASHLAND 0080

**Provided** there has been full compliance with the following warranties and conditions.

1.  (A)  In respect of Bulk Crude Oil shipments only:

    **Prior to loading** – warranted that the vessel's cargo tanks and loading facilities be examined and approved by a Surveyor, who shall issue a certificate attesting to the suitability thereof to carry the proposed cargo;

    (B)  In respect of all other Bulk Liquid shipments:

    **Prior to loading** – warranted that the vessel's cargo tanks and loading facilities be cleaned, examined and approved by a Surveyor, who shall issue a certificate to this effect.

2.  **At time of, and during, loading** – Warranted that careful measurements as to gauge, weight and temperature of the separable components of the shipment be made and certified to by a Surveyor, who shall also supervise loading and repeat (and certify to) such measurements as frequently as he deems necessary and desirable.

3.  **Prior to, and during, discharge** – Warranted that careful measurements as to gauge, weight and temperature of the separable components of the shipment be made and certified to by a Surveyor, who shall also supervise outturn and repeat (and certify to) such measurements as frequently as he deems necessary and desirable.

4.  **Connecting Conveyances** – Warranted that where, by the terms of this insurance, coverage begins in, or continues in, tank truck, tank cars, tank barges, other tank vessels or pipe lines other than those of the principal carrier, the requirements named herein with respect to supervision and certification be applicable as if the connecting conveyance, or pipe line, were the principal carrier.

5.  **Warranted fee** from claim for rancidity or inherent vice.

6.  **Shortage and/or leakage losses** – It is understood and agree that the measure of loss due to shortage and/or leakage, if covered hereunder, shall be determined by a comparison of:

    The survey or surveys made at points of origin with the survey or surveys made at point of destination, subject always to the deductible, unless such loss is as a result of a peril or perils enumerated above wherein no deductible shall apply.

45

ASHLAND 0081

7.   **Contamination Losses** – It is understood and agreed that a loss due to contamination, if covered hereunder, shall be verified by a test or tests made by a chemist, and the measure of loss, based on the findings in such a test or tests, shall be the actual cost of recondition (including all expenses incidental thereto), loss of weight, and also depreciation on such portion or portions as cannot reasonably be restored to original condition.

8.   **Definition and Fees** – It is further understood and agreed that where reference is made to "Surveyor" or "Chemist", such reference shall be deemed qualified by "approved by the Company". All fees, however, shall be at the expense of the Insured, except that, in the event of loss, this Company shall be liable for the cost of surveys and tests necessary to determine the amount of claim hereunder.

**All other terms and conditions remaining unchanged.**

_Per_  National Union Fire Insurance Company of Pittsburgh, PA

46

ASHLAND 0082

**SCHEDULE OF RATES**

Attached to and forming part of Marine Policy no. **"As Per Declaration Page"** and War Risk Policy no **"As Per Declaration Page"**.

These rates are effective with respect to shipments of insured goods and/or merchandise and/or property made on and after  **"As Per Declaration Page"**

which are shipped on metal-hulled, self-propelled vessels which are not over 20 years of age nor less than 1000 net registered tons and which are classed A1 American Record or equivalent by a member of the International Association of Classification Societies; or vessels over 20 years of age which are approved by This Insurer, and which are not less than 1000 net registered tons and classed as above, but only while operating in their regular trade; but in either case excluding vessels built:

> for service on the Great Lakes;
> solely for military or naval service; or
> for carriage of dry bulk or liquid bulk cargoes and which are more
> than 15 years of age, unless specifically approved by This Insurer.

All shipments of insured goods and/or merchandise and/or property which are made on vessels excluded or not provided for by the above wording, are covered at rates to be arranged.


|  **INTEREST:** |  **RATE:** |
| --- | --- |
| As Per Declaration Page | As Per Declaration Page |

**All other shipments and/or interests at rates to be agreed.**


**Marine rates subject to change upon 30 days notice from This Insurer.**


**WAR, STRIKES, RIOTS AND CIVIL COMMOTIONS: "As Per Declaration Page"**

47

ASHLAND 0083

**THE INSURANCE COMPANY SIGNATORY HERETO**
**(HEREINAFTER CALLED "THIS INSURER")**
**BY THIS POLICY OF WAR INSURANCE**
**IN CONSIDERATION OF PREMIUM AS AGREED**
**DOES INSURE**

**"As Per Declaration Page"**

**and its Subsidiary, Associated, Affiliated and**
**Interrelated Companies and Joint Ventures in**
**which it has now or may have a direct or indirect**
**interest and other entities for whom they may have**
**instructions to insure or deem themselves responsible to insure.**

**(HEREINAFTER REFERRED TO AS "THE INSURED")**

48

ASHLAND 0084

## AMERICAN INSTITUTE CLAUSES (DECEMBER 2, 1993)

THIS POLICY OF INSURANCE WITNESSETH, that in consideration of premiums as agreed to be paid The Insurer does make insurance and cause **"As per Declaration Page"** to be insured, lost or not lost, for account of whom it may concern, against War Risks only, in accordance with the terms and conditions hereinafter set forth.

To apply to shipments made on or after **"As Per Declaration Page."**

This Insurer shall not be liable hereunder for more than **"As Per Declaration Page"** by any one vessel.

In cases where the total value(s) at risk on any one vessel exceed(s) the limit of liability as set forth in this Policy, The Insured agrees, nevertheless to report to The Insurer full value(s) at risk and to pay premium thereon at the agreed rates. The Insured further agrees that acceptance of such reports and premium by the Insurer shall not serve to revoke or to overrule the limit of liability set forth in this Policy; however, subject to the limit of liability, The Insurer in accepting these reports does agree to pay partial losses covered by this Policy without reduction by reason of any coinsurance which otherwise may have existed in the absence of this special agreement.

Subject to the provisions of Clause 4 of this Policy, should there be an accumulation of interests exceeding the above limit of liability by reason of any interruption of transit beyond the control of The Insured or by reason of any casualty, and/or after the interests have been discharged from incoming overseas Vessel at an intermediate port or place for on-carriage from that or any other port or place by another overseas Vessel, this Policy shall attach for the full amount at risk (but in no event for more than twice the Policy limit which would be applicable to any one Vessel) provided written notice be given to This Insurer as soon as known to the Assured.

This Policy shall cover only those shipments which are insured against marine risks under Policy No. **"As Per Declaration Page"** of This Insurer, it being agreed that the description of such shipments, the valuations thereof, the voyage, the designation of the overseas Vessel (which shall be construed to include aircraft if included under the marine policy) on which the goods are to be carried and the ports and/or places of loading and discharge, as reported under the said Policy against marine risks, shall be deemed incorporated herein. Notwithstanding the foregoing, this policy shall not cover purely domestic shipments by air between points in the United States of America (excluding Alaska and Hawaii).

Any loss payable hereunder shall be payable in funds current in the United States, to the order of Named Insured thirty days after the full proofs of loss and proofs of interest have been filed with The Insurer.

1. (a)   This insurance is only against the risks of capture, seizure, destruction or damage by men-of-war, piracy, takings at sea, arrests, restraints, detainments and other warlike operations and acts of kings, princes and peoples in prosecution of hostilities or in the application of

ASHLAND 0085

sanctions under international agreements, whether before or after declaration of war and whether by a belligerent or otherwise, including factions engaged in civil war, revolution, rebellion or insurrection, or civil strife arising therefrom; the imposition of martial law, military or usurped power, and including the risks of aerial bombardment, floating or stationary mines and stray or derelict torpedoes.  Warranted not to abandon (on any ground other than physical damage to ship or cargo) until after condemnation of the property insured.

(b)   This insurance also covers, but only while property insured is on board a waterborne conveyance, loss of or damage to said property directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that the accident or occurrence creating the situation which required such governmental action would have resulted in a recoverable claim under this Policy (subject to all of its terms, conditions and warranties) if the property insured would have sustained physical loss or damage as a direct result of such accident or occurrence.

2.       Warranted free from any claim based upon loss of, or frustration of, the insured voyage or adventure caused by arrests, restraints or detainments.

3.       This insurance does not cover any loss, damage or expense directly or indirectly arising from, contributed to, or caused by any of the following causes, whether due to a peril insured against or otherwise:

(a)   Commandeering, preemption, requisition or nationalization by the government (defacto or otherwise) of the country to or from which the goods are insured.

(b)   Seizure or destruction under quarantine, environmental or customs regulations.

(c)   Delay, deterioration and/or loss of market.

(d)   Nuclear reaction, radiation, or radioactive contamination, regardless of how it was caused.

4.       (a)   The insurance against the risks enumerated in Clause 1., except the risks of floating or stationary mines and stray or derelict torpedoes, floating or submerged referred to in (b) below, shall not attach to the interest hereby insured or to any part thereof

(i)   prior to being on board an overseas Vessel (For the purpose of this Clause 4 an overseas Vessel shall be deemed to mean a Vessel carrying the interest from one port or place to another where such voyage involves a sea passage by that Vessel).

50

ASHLAND 0086

    (ii)    after being discharged overside from an overseas Vessel at the intended port of place of discharge.

or

            after the expiry of 15 days from midnight of the day of arrival of the overseas Vessel at the intended port of discharge, whichever shall first occur.

    (iii)    after expiry of 15 days from midnight of the day of arrival of the overseas Vessel at an intermediate port or place to discharge the interest for on-carriage from that or any other port of place by another overseas Vessel, but shall reattach as the interest is loaded on the on carrying overseas Vessel.  During the said period of 15 days the insurance remains in force whether the interest is awaiting transit or in transit between the overseas Vessels.

    (iv)    For the purposes of this Clause 4 arrival at the intended port or place of discharge shall be deemed to mean that time when the overseas Vessel first berths, anchors, moors, or is secured in an area subject to regulation by the authorities of such port of place.

(b)    The insurance against the risks of floating or stationary mines and stray or derelict torpedoes, floating or submerged, attaches as the interest hereby insured is first loaded on a lighter, craft or vessel after leaving the warehouse at point of shipment in transit for the destination declared hereunder, and ceases to attach as the interest is finally landed from the vessel, craft of lighter prior to delivery to warehouse at such destination.

(c)    If the contract of affreightment is terminated at a port or place other than the destination named therein such port or place shall be deemed the intended port or place of discharge for the purpose of this Clause 4.

(d)    Shipments by mail, if covered by this Policy, are insured continuously from time of leaving sender's premises until delivered to the place of address.

(e)    Shipments by air (other than by air mail), if covered by this Policy are insured subject to the same terms and conditions as shipments by overseas Vessel.

(f)    It is a condition of this insurance that the Insured shall act with reasonable dispatch in all circumstances within their control.

51

ASHLAND 0087

(g)     If anything contained in this Policy shall be inconsistent with this Clause 4 it shall to the extent of such inconsistency be null and void.

5.      This insurance shall not be vitiated by deviation, overcarriage, change of voyage, or by any error or unintentional omission in the description of interest, vessel or voyage, provided the same be communicated to the Insurer as soon as known to the Insured  and an additional premium paid if required.

6.      And in case of any loss or misfortune, it shall be lawful and necessary to and for the Insured, his or their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the said goods and merchandise, or any part thereof, without prejudice to this insurance; nor shall the acts of the Insured or Insurers, in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of an abandonment; and to the charges whereof, the said Insurers will contribute according to the rate of quantity of the sum hereby insured.

7.      General Average and Salvage Charges payable according to United States laws and usage and/or as per Foreign Statement and/or as per York-Antwerp Rules (as prescribed in whole or in part) if in accordance with the Contract of Affreightment.

8.      It is agreed that the reports of shipments made under the Policy against marine risks mentioned above shall be deemed to be reports under this Policy also, and The Insured agrees to pay premiums on all shipments insured under this Policy at the war risk rates of The Insurer as fixed from time to time.

9.      No claim shall be payable hereunder which arises from collision, contact with any fixed or floating object (other than a mine or torpedo), stranding, heavy weather or fire unless caused directly (and independently or the nature of the voyage or service which the Vessel concerned or, in the case of a collision, any other Vessel involved therein, is performing) by a hostile act by or against a belligerent power; and for the purpose of this paragraph "power" includes any authority maintaining naval, military or air forces in association with a power.

10.     No recovery for a Constructive Total Loss shall be had hereunder unless the property insured is reasonably abandoned on account of its actual total loss appearing to be unavoidable, or because it cannot be preserved from actual total loss without an expenditure which would exceed its value if the expenditure had been incurred.

11.     It is agreed that this Policy is a separate and wholly independent contract and is not subject to any terms or conditions of the Policy against marine risks above mentioned (whether physically attached thereto or not) except as such terms or conditions shall have been expressly incorporated herein by reference.

12.     This insurance may be cancelled by either party upon forty-eight hours written, telegraphic or telefaxed notice to the other party, but such cancellation shall not affect any

52

shipment on which this insurance has attached under the terms of Clause 4 hereof prior to the effective date of such notice.  Shipments on which this insurance has not so attached but for which, prior to the effective date of such notice, bills of lading have been issued and (in the case of exports) Certificates or special policies have been issued and negotiated, shall be covered from the time of loading on the overseas Vessel, as provided in Clause 4, at the rates of The Insurer, provided that, prior to said effective date, such shipments were at the risk of The Insured and were covered under the said Policy against marine risks.

In the event of loss which may give rise to a claim under this policy, prompt notice should be given to These Insurers.

Wherever the words "This Insurer"or "The Insurer" may appear in the policy they are deemed to include also the words "These Insurers."

**REQUIRED BY LAW:**

Any provisions required by law to be stated in policies issued by this Insurer shall be deemed to have been stated herein.

In the event that this policy is subscribed to by several Insurers, it is agreed that, upon request The Insurers will issue separate policies covering their subscription.

IN WITNESS WHEREOF, this Insurer has executed these presents at San Francisco, CA, **"As Per Declaration Page."**

**Policy Number "As Per Declaration Page"**

ASHLAND 0089